## THE ALBANY.

### McCULLOUGH et al. v. THE ALBANY.

(Circuit Court of Appeals, Second Circuit. July 21, 1897.)

1. ADMIRALTY APPEALS—WEIGHT OF EVIDENCE—COLLISION—FINDINGS BELOW.

When the district judge has rejected the positive testimony of witnesses who were in the best position to know the facts, and has accepted the testimony of others whose opportunities of knowledge were not so good, on the expressed ground that the rejected testimony does not harmonize with some theory as to the movements of the vessels, or with the inherent probabilities of the case, there is no reason why the appellate court may not review the testimony unembarrassed by the findings below.

2. SAME—COLLISION BETWEEN FERRYBOATS—EVIDENCE.

The ferryboat S. left Chambers street, New York, for Pavonia ferry, Jersey City; going up the river a little eastward of the higher ferryboat, H., which hid her lights from vessels to the westward. The ferryboat A.. coming down from Weehawken, and bound for Franklin street, New York, was at the same time obscured from the S. by the H. The A. turned in under the stern of H. to make her slip, and then came in view of the S.. when it was too late for either to avoid collision. Held, on conflicting evidence, that the S. maintained her course up the river, and did not also turn in under the H.'s stern, as contended by the A., and that she was not, therefore, guilty of any contributory fault. 74 Fed. 314, reversed.

Appeal from the District Court of the United States for the Southern District of New York.

This is an appeal from a decree of the district court, Southern district of New York, apportioning the damages in an action arising out of a collision between the libelants' ferryboat Susquehanna and the claimant's ferryboat Albany. The district judge held both vessels in fault, but only the libelants appealed. 74 Fed. 314.

Wilcox, Adams & Green, for appellants.

Ashbel Green (Herbert E. Kinney, of counsel), for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. About 9:45 p. m. of February 20, 1895, the Susquehanna left the foot of Chambers street, New York, on a trip to the Pavonia ferry, Jersey City. She ran out from her slip, and, under a port wheel, turned upstream somewhat east of the middle of the river. At about the same time the Hamburg, a double-decked ferryboat of the Hoboken Ferry Company, left her slip at the foot of Barclay street, which is below Chambers street, also ran out, and swung up the river, bound for the foot of Newark street, Hoboken. By the time they had steadied on their respective courses, both boats were heading about up the river,—the Hamburg a little more towards the Jersey shore. The Susquehanna was to the eastward of the Hamburg about a length to a length and a half, her bow lapping

on the Hamburg's starboard quarter.  The Hamburg was the faster boat, and as they proceeded up the river she gradually drew ahead, until she left the Susquehanna entirely astern.  Meanwhile the Pennsylvania tug Harsimus, with a car float in tow, was proceeding directly across the river from pier 29, North River, to Harsimus Cove, next to the abattoir in Jersey City, which is some 500 feet south of the lower slip of the Pavonia ferry.  About 9:30 o'clock the West Shore ferryboat Albany left Weehawken, N. J., bound for Franklin street, New York.  The distance is about 4½ miles, and she hugged the Jersey shore pretty well all the way, to get the benefit of the tide, which, her pilot says, was slack in mid river, but running ebb along shore.  As she reached a point nearly opposite the Pavonia ferry the ferryboat Delaware ran out of the slip, bound for Chambers street, New York, and the Albany slowed down and headed for her own slip at the foot of Franklin street, New York.  A line drawn across the river at Franklin street would be about halfway between the two Erie terminal slips.  In other words, by the time she was opposite Franklin street an Erie ferryboat would have made only about half the northing necessary to bring her from Chambers street to Pavonia.  While the fleet was in this position the colored lights of the Albany and the Susquehanna were obscured from the view of each other by the high double deck of the Hamburg, and the Albany, on a crossing course, was drawing nearer to the other two vessels, which were crossing her bows; the Hamburg showing her red light, and the Susquehanna presenting her red light, temporarily obscured from the Albany by the superstructure of the Hamburg.  Proceeding thus, the situation so changed that, as the district court finds, "when off Franklin street, and probably about one-third of the way across the river, * * * [the Hamburg] drew away from between the Susquehanna and the Albany, so that the red lights of each became suddenly visible to the other a few hundred feet apart.  Each ferryboat at once ported her helm, and very soon each reversed her engine, but they came in collision before the progress of either was stopped." The details of navigation subsequent to the time when the Hamburg moved out of the line of sight need not be rehearsed, for the district court has found that "the collision did not arise from anything that can be called a legal fault after the vessels were aware of each other's near presence."  The faults for which both vessels were condemned are thus stated in the opinion:

(1) "The primary fault was in proceeding so near to another high vessel as to be concealed from the view of others likely to be approaching, so as to leave no sufficient time for any effective maneuvers after the proximity of the other vessels is known."  (2) "Each boat, I find, was swinging under the stern of the Hamburg in order to go to her slip.  * * *  There was not the least need of navigating or rounding so near to the Hamburg.  * * *  She [the Susquehanna] had no right voluntarily and unnecessarily to hide her side lights behind the Hamburg, and then draw under her stern without giving any such timely notice by lights and signals as is required." etc.

As above expressed, the first of those faults might be held to arise whenever a vessel navigating in a crowded harbor, on a fixed course, as in the case of a ferryboat, is temporarily "blanketed" by some faster craft overtaking her.  The affirmance in the circuit court in the

cause of The Seacaucus (reported in district court; 34 Fed. 68), which was referred to on the argument, was upon the ground of an abrupt sheer around the stern of the intervening boat by the Hawley, and the failure to keep a proper lookout by the Seacaucus. We are not prepared to hold that the mere fact that a faster vessel has temporarily obstructed the view from and towards another vessel is sufficient to charge that vessel with fault, when its lookouts have been vigilant, and it attempts no change of course until after the intervening vessel has moved so far ahead as to cease to be an obstruction to the view of other vessels. So long as neither vessel of the two which have been temporarily hidden by a third draws or swings or crosses under her stern without giving opportunity for timely notice to and from whatever craft may be found beyond the removed obstruction. it is difficult to see how either of them is guilty of a fault tending to bring about collision. There may be cases where one vessel voluntarily places herself so close to another one, and unnecessarily continues in her place of concealment so long, as to warrant a finding that her navigation is imprudent, but the facts in proof here do not warrant such a finding. The district court, however, as appears from the citation supra, held that each boat was in fault for swinging under the stern of the Hamburg so quickly as to prevent the giving or receiving of timely notice to and from whatever vessel the Hamburg had previously obscured. That the Albany committed this fault is undisputed here, since she has not appealed; and, even if she had appealed, the evidence abundantly shows that she did swing in close under the Hamburg's stern, passing within 100 feet of that vessel. The only question to be considered is whether the Susquehanna also swung to port as the Hamburg cleared her. Objection is taken to any consideration of this question on the ground that the evidence below was conflicting, that the district judge heard and saw the witnesses, and that his finding of fact thereon will not be disturbed. This general rule, however, is not without exceptions. The Gypsum Prince, 14 C. C. A. 573, 67 Fed. 612. When the district court has rejected the positive testimony of witnesses who were in the best position to know exactly what the truth was as to some disputed fact, and has accepted the testimony of others whose opportunity to know the truth was manifestly not as good, and does this on the expressed ground that the testimony rejected does not harmonize with some theory as to the movements of the vessels or with the inherent probabilities of the case, there is no reason why the appellate court should not review the testimony unembarrassed by the finding as to such fact. The "personal equation" of the witnesses is of no assistance in determining what are or are not the probabilities of the case.

In this case, as in that of The Gypsum Prince, supra, the testimony of those on the Susquehanna, including her pilot and wheelsman, is direct and positive that she did not swing to port, but continued heading "up the river," as the Hamburg drew ahead, intending to continue on that course until above their slip, and then to turn in and make it. They testify that they thus continued until they saw the Albany, and the subsequent navigation of both vessels need not be described, since we concur with the district court in the conclu-

sion that there was no "legal fault after the vessels were aware of each other's presence." So far as the pilot and wheelsman are concerned, they knew better than any one else whether or not the wheel was kept amidships, or revolved to port or starboard. Their knowledge is not derived from observation of the changing or unchanging of the relative positions of surrounding objects, but is direct and positive; for, if the wheel moved, they, and they only, moved it. If, then, it be found that the Susquehanna did swing to port under the Hamburg's stern, there is no excuse for their testimony on any theory of careless observation, or imperfect inferences, or miscalculation of distance or time. Such a finding as to the Susquehanna's navigation is a finding that her pilot and wheelsman testified falsely when they must have known the truth. We have most carefully examined the testimony of these two witnesses. It is clear and apparently straightforward, both on direct and cross-examination, and presents no inconsistencies. We do not find that it conflicts with the proof as to the place of collision, or the course of the Hamburg. The pilot's estimate that, when he swung into the course outside of the Chambers street slip, he was about a quarter of the way across the river, was an estimate, merely, and he says that later on both vessels were near the middle of the river. Nor does he undertake to give his course with absolute accuracy: It was not a compass course. He "kept moving his wheel first one way and then the other, just to keep straight up,—to keep it steady." And, although his impression was that he was heading a little more towards New York than towards Jersey, it is apparent from his whole testimony that this is not a very positive impression. What he is sure of, and reiterates whenever asked, is that he kept on "heading about straight up the river." We find nothing in the evidence of the pilot or the wheelsman, considered by itself, calculated to discredit its general accuracy. In nearly every particular it is corroborated by the testimony of the disinterested witnesses, most of whom come from the Hamburg. One disinterested witness only contradicts the evidence from the Susquehanna in several particulars, and testifies that she did sheer under the stern of the Hamburg. This is the pilot of the Harsimus. His testimony is confused, involved, and so full of contradictions that it is entitled to but little weight. He says the whistle of the Susquehanna was blown when the Hamburg was crossing the bow of his float, and about 400 feet away; that it was not blown till after the Susquehanna crossed under the stern of the Hamburg (so that collision must have taken place beyond the Hamburg's wake); and that the collision took place within 200 feet of the bow of his float, which was off pier 29, and five blocks further up the river than all the other witnesses from both sides make it. Elsewhere he says that the Hamburg was "on the starboard side of the Albany"; "that the Hamburg was between the Albany and the New York shore.—that is, he would be to the right of the Albany." We find in the story of this witness nothing to discredit the testimony of the pilot and wheelsman of the Susquehanna. The witnesses from the Albany, including her pilot and wheelsman, testify that the Susquehanna changed her course to the

westward. They admit that they changed their own course to the eastward, and headed for their slip at Franklin street, intending to proceed there when the Hamburg left the course open to them. Their knowledge as to their own change of course is positive. What they assert as to the change of course of the Susquehanna is an inference from observations. Their story is that they first saw the Susquehanna's red light about one or two points on their port bow; that she was then "above them in the river" (that is, further north than they were); and that she (the Susquehanna) then turned around and came down the river, into collision with them, showing both lights. To do this, the Susquehanna, for no suggested or conceivable reason, must have changed her course so as to head for the slip of the Pennsylvania ferry on the Jersey shore,—a slip which lies further down the river than the one from which she started. This story is so wildly improbable that we are inclined to give it no weight. The district judge evidently discredited the testimony from the Susquehanna mainly because it seemed to him improbable. "It is not probable," says the opinion, "that the Susquehanna was heading nearly straight up the river, or had come up on that heading. * * * Moreover, the Susquehanna was so nearly opposite the Pavonia ferry that it is the highest degree unlikely that on the first of the ebb she would not have been previously crossing towards her slip * * * if the Hamburg did not prevent her. I have no doubt that her probable course was the true one, and that she was in fact delayed somewhat in heading to the westward by the Hamburg, which was in her way." The evidence is most positive—part of it from disinterested witnesses and wholly uncontradicted—that the Erie ferryboats, in making their Jersey slip on an ebb tide, "generally head up the river until they get above the slip," in order to give room to turn when above the slip, so as to meet the effect of the tide and come into the slip head on. It would seem to be not only probable, but most likely, that the Susquehanna would pursue the usual course when navigating in such a tide. The pilot of the Harsimus testified that the tide was still flood, and that when he stopped his tug and tow they drifted a little up stream. But all the other witnesses testified that it was the beginning of the ebb,—slack, perhaps, in mid river, but running ebb along the piers; the very situation in which the Erie boats usually navigated as her witnesses say the Susquehanna did on this occasion. The pleadings of both sides aver that it was ebb. The Albany, as before stated, had been hugging the Jersey shore on her way down expressly to get the advantage of the ebb. Had the Susquehanna turned so as to cross the river in the direction of her slip before she had got above it, she would have had to work her way in, angling against the tide, and no witness suggests that such is usual or convenient navigation. Moreover, we are not satisfied that the Susquehanna was "nearly opposite the Pavonia ferry" when the Albany came in sight. The pilot of the Harsimus puts the collision within 200 feet of the bow of his float, but, even on his own statement, that point would be 500 feet or more below the Pavonia ferry. All the other witnesses, however, without exception, put the place of collision much further

down stream about opposite Franklin street or the street above it. Certainly it would be unusual navigation, on an ebb tide, to lay a direct course from that point to the Pavonia slip. We agree with the district judge that "her probable course was the true one," but believe that her probable course was the one usually followed in such a condition of the tide.

Another suggestive fact most strongly corroborates the testimony of the pilot of the Susquehanna. As the Hamburg and the Susquehanna proceeded up the river, they had the Harsimus crossing their course on the starboard hand. It was their duty, therefore, to avoid her, and the Harsimus' duty to keep on. They might have avoided her by slacking up, sheering to starboard, and going astern of her. They might, also, with the Harsimus' assent, have crossed her bows; but, if they wished to adopt the latter course, it was most imperatively their duty to signal such intention to the Harsimus by a two-blast whistle, and obtain her assent to such maneuver. To undertake to cross in front of the Harsimus without giving such signal would have been reckless negligence. The Hamburg, wishing to cross the Harsimus' bows, gave a two-blast signal, which was assented to, but the Susquehanna gave no signal whatever to the Harsimus. This circumstance supports the evidence of the Susquehanna's pilot that he did not wish to attempt to cross the tug's bows, as he might thus "get crowded to Jersey," and that he ported his wheel a little to go under the tug's stern. We find nothing in the angle of collision which conflicts with the Susquehanna's story. The Albany undoubtedly ported after the Susquehanna came in view, and the consequent swing to starboard would tend to bring the boats together on nearly opposite courses. The decree of the district court is reversed, with costs, and the cause remitted to the district court, with directions to decree for damages against the Albany alone.