## THE F. B. SQUIRE.

### (Circuit Court of Appeals, Second Circuit.    December 11, 1917.)

### Nos. 49-51.

1. ADMIRALTY ⟨⟩118—REVIEW ON APPEAL—FINDINGS OF FACT.

Where a narrow issue of fact is presented, upon which the evidence is conflicting, the decision of an experienced trier of facts, who heard the witnesses, is not to be set aside, unless certainty of error can be asserted.

2. MASTER AND SERVANT ⟨⟩301(1)—LIABILITY FOR INJURIES TO THIRD PERSONS—MASTER PRO HAC VICE.

A vessel arrived in port with a cargo of wheat, a small part of which was damaged, and was sold by the underwriter while still in the ship. It was taken out by the purchaser, the ship furnishing the winch and winchman, and through the negligence of the winchman employés of the purchaser engaged in the work were injured. No contract for such service was made, and no charge was made by the ship therefor. It was customary for the ship to furnish winch and winchman in such cases, and everybody assumed that this would be done. There were only 500 bushels of the wet wheat, and it was to the interest of the ship that it should be promptly taken out. *Held*, that the winchman did not become pro hac vice the employé of the purchaser, but remained the servant of the ship, which was liable for his negligence.

Appeals from the District Court of the United States for the Western District of New York.

Suits in admiralty by Walter L. Kennerdell, by Frank Preston, and by George Hackemer, Jr., an infant, by his guardian ad litem, against the steamship F. B. Squire; the Jenkins Steamship Company, claimant. Decrees for libelants, and claimant appeals. Affirmed.

Final decrees in admiralty were entered in the District Court for the Western District of New York. The steamship Squire, laden with wheat, arrived at her port of destination (Buffalo) with a small portion thereof wet. This damage was ascertained before unloading. Claim was made against underwriters of cargo, who accepted liability, considered the wet wheat their own, and offered it for sale. Sale was held on or alongside the ship; the damaged wheat being still in the hold. The successful bidder testified that the insurers' agent advised him that the shipmaster would "hoist the grain up" out of the hold, but that he had no talk, and made no specific arrangement, with said master.

The insurers' agent, who conducted the sale, did not remember that he had had any conversation on the subject, but that he "may have said that [the purchaser] probably could arrange with the captain to hoist it." The ship captain testified that the agent said to him, "Will you give [the purchaser] a winch?" and he replied, "Yes, I will accommodate him with a winch," adding "I will give [him] a man to operate the winch." The captain further declared that he never permitted anybody but his own men to run a winch, and that he had no arrangement for payment to the ship in respect of the winch and workman, in so far as their labor hoisted wet, rather than sound, grain. In point of fact, no charge was ever made by the ship as to damaged grain, nor was payment for the service ever offered. Whether this method of procedure was customary the master did not know.

There was evidence that in respect of wet grain it was the custom of Buffalo "to furnish the labor to deliver the wet grain out of the hold of the ship," though one witness confined that custom to the delivery of "wet stuff out of the cargo hold," when the carrier was liable for damage, saying that, when "the underwriters sell the grain, we [i. e., the shipowners] don't pay any

---

attention to it whatever." It is clear from the evidence that, if the ship had charged for the winch and man, the underwriters would have felt obliged to pay. But it is also plain by inference that (at least) when the amount of injured grain was very small, compared with the whole cargo, the ship put it overside with the rest of the lading and made no separate charge; it being the admitted duty of the vessel to deliver her sound cargo alongside at her own cost and charges. At the rate sworn to, the expenses of hoisting out the amount of wet grain in this case (500 bushels) would have been very trifling, and no one paid any attention to it.

The purchaser of the "wet stuff" sent employés of his own into the hold to prepare drafts. One man employed by the purchaser was stationed at the hatchway (standing on a hatch cover), in order to steer or guide the drafts coming out of the hold at the end of a fall moved by the winch; that machine being operated by a member of the steamer's crew. One of the drafts caught under the hatch cover, dislodged it, and precipitated hatch cover and man into the hold, producing, either by the fall itself, or contusions from the falling hatch cover, injuries to the three libelants named above. They severally instituted these suits against the ship. The trial court sustained all the libels, and the claimants of the steamship took these appeals.

S. H. Holding, of Cleveland, Ohio (Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, of counsel), for appellant.

Hamilton Ward, of Buffalo, N. Y. (W. J. Wetherbee, of Buffalo, N. Y., of counsel), for Kennerdell and Preston.

Lawrence J. Collins, of Buffalo, N. Y., for libelant Hackemer.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

HOUGH, Circuit Judge (after stating the facts as above). [1] The record contains some direct evidence that the winchman hoisted the draft so rapidly that it could not be guided clear of the hatchcovers. On conflicting testimony regarding matters which must all have occurred in a few seconds, the trial judge believed that this unnecessary and dangerous speed had occurred, and found therein the proximate cause of disaster. It is not possible to reconcile the stories of the few witnesses herein who could speak of the accident itself, and without exception their testimony is the reverse of disinterested. It is easy to point out discrepancies and improbabilities, but the main question stands out clearly enough, namely, whether the hatchcover fell into the hold by the clumsiness of the man who stood on it or by the haste of the winchman.

When so narrow an issue is presented by such a record, the decision of an experienced trier of facts, who saw and heard the plain men who told their stories in language loose and ungrammatical, to say the least, is not to be set aside unless certainty of error can be asserted. That we should hesitate to reach the same conclusion from the printed depositions does not, and should not, induce reversal of a finding based on sight and hearing. For these reasons we accept and adopt as a finding of fact that the winch was run with such speed that reasonable skill could not prevent the train of happenings resulting in the injuries giving rise to these three libels. Brookheim v. Greenbaum, 225 Fed. 763, 141 C. C. A. 89; New England S. S. Co. v. New York &c. Co., 207 Fed. 73, 124 C. C. A. 633.

Assuming that the negligent act producing injury was that of the winchman, the question remains whether, when it was committed, that man was the servant of the ship engaged in ship's work, or pro hac vice the employé of the purchaser of the wet grain. On this vital point each party appeals to the rules of law stated in Standard Oil Co. v. Anderson, 212 U. S. 215, 29 Sup. Ct. 252, 53 L. Ed. 480. It is there pointed out that one wishing to accomplish a given work, and neither having the necessary workmen, nor desiring to take them into his general service, may procure help from another for the accomplishment of that particular work. This emergency employment may take either of two forms: In the first the temporary workers become the servants of the man to whom they are lent; in the second the general employer retains his mastership by agreeing to "furnish the completed work" through his own employés.

To assign any given case to one or the other class, inquiry must be made "whose is the work being performed," while carefully distinguishing "between authoritative direction and control and mere suggestion as to details or necessary cooperation, where the work furnished is part of a larger undertaking." These are the principles by which (as the court remarked in the cited case) the facts in evidence are to be considered.

The facts in the present litigation are in one sense very easy of statement. No one concerned or interested in the wet grain at the time bestowed a thought on the subject now advanced as the corner stone of decision. We are satisfied that it was customary for the ship to furnish winch and man, that everybody assumed that this would be done, that the grain was sold on that tacit assumption, and that no one expected any special charge to be made for putting a little wet wheat overside.

Evidence is to be read in the light of experience, and it is plain enough that the ship wanted the grain out promptly, as she was to sail in a few hours, that to refuse a winch and man would cause anger and delay, and that any captain who would not oblige in a matter apparently so small would not thereby increase his popularity alongshore. Therefore it was in a real sense for the benefit of the ship that man and machine were furnished.

Evidence producing in its entirety the foregoing impression wholly fails to prove any change in the usual and normal relations of the parties; they were not aware of change, thought of none, intended none, and it is very artificial to attribute to their words a meaning or result not thought of by the speakers. No one would have been more astonished than the ship captain to have been told that his winchman had become an employé of the grain purchaser. For these reasons we find no proof of any agreement that winch and man should change their normal relation to the ship, and the burden of evidence is on him who alleges a variation from the normal. If there was no contract— i. e., no meeting of minds—on the subject, the mere fact that the ultimate object was to get out of the hold the grain of a man to whom the ship owed no contractual duty did not change the relationship of any man to any master. As pointed out above, there was much reason for

the ship's wanting to get rid of the grain, and even a gratuitous service does not discharge him who renders it from the duty of ordinary care.

Being therefore of opinion that employment pro hac vice is not proven, that the burden is on claimants in that regard, and that libelants were injured in the negligent performance of work partly for the benefit of the ship and by a ship's servant, the decrees appealed from are affirmed, without interest and with one bill of costs, to be taxed in the case of Kennerdell.