88 F.2d 125 (1937)
THE S. S. BERWINDGLEN.
RAWDING
v.
HOOTEN.
No. 3203.
Circuit Court of Appeals, First Circuit.
February 12, 1937.
*126 Walter X. Connor, of New York City (Vernon Sims Jones and Kirlin, Campbell, Kickox, Keating & McGrann, all of New York City, and Burnham, Bingham, Pillsbury, Dana & Gould, of Boston, Mass., on the brief), for appellant.
Edmund M. Murray, of Boston, Mass. (Gazan & Caldwell, of New York City, on the brief), for appellee.
Before BINGHAM, WILSON, and MORTON, Circuit Judges.
WILSON, Circuit Judge.
This is an appeal from a decree in admiralty by the District Court of Massachusetts. The proceeding is in rem by the libelant against the steamship Berwindglen seeking to recover for injuries alleged to have been received in the service of the vessel and for maintenance and cure following his injuries.
The steamship Berwindglen was engaged in carrying coal from Norfolk, Va., to Bath, Me., and was tied up at the wharf in the latter city unloading on August 2 or 3, 1932. The libelant had shipped on the vessel as an able-bodied seaman about July 26, 1932.
On the evening of August 3d about 7 o'clock (D.S.T.) the libelant left the ship to call on a former acquaintance living in Bath. An ordinary carpenter's ladder lashed to the side of the ship and leading to the dock furnished the means of leaving and entering the ship. This ladder was about 30 feet long and stood out from the side of the vessel at an angle of about 45 degrees. The bulwarks of the vessel at high tide were about 25 feet above the dock level.
The libelant returned to the ship at about 1:45 o'clock (D.S.T.) the next morning and in attempting to mount the ladder fell from it to the dock and received the injuries complained of in his libel.
Appeals in admiralty before this court are heard de novo. Findings of fact by the District Court, while not conclusive on appeal, will not be disturbed unless clearly wrong, but material facts not definitely found by the District Court may be determined by this court upon the evidence.
While ashore at some time during the evening, the libelant fell in with two other members of the crew of the Berwindglen, and as the watchman on the ship said on their return at 1:45 o'clock the next morning: "It looked to me the boys had been out for what they call a good time."
Hooten admitted that he drank two or three bottles of beer or home brew. Another member of the party testified that they had two pints of whisky or "rot gut," as he called it. At all events, they hired an automobile, rode to Brunswick, a village about 10 miles from Bath, and back, and when Hooten reached the dock one of his companions described his condition as "half in the bag." Hooten tripped over a rope stretched across the walk leading to the ship, although his attention was called to it by his companion, who also tried to assist him in going up the ladder. One of Hooten's shoes came off before reaching the top and while his companion was going back to pick it up, the libelant lost his balance and fell to the dock.
A doctor was called, whose testimony is best descriptive of the libelant's condition as the cause of his falling. The doctor testified as follows:
"Seeing this man on the ground the first thing naturally I examined the man to see if there is any serious injury, particularly any serious head injury, to make up my mind whether to send him to the hospital or send him aboard ship. I tried to examine the patient and at the same time smell his breath. He was swinging wildly 
"Q. What did you say, doctor? A. He was swinging wildly and using foul language, and I told him who I was, that I was a physician and came to examine him and help him; but he absolutely refused; said he didn't want any doctor.
"I turned around to the men and said: `Let us get him up in the boat, as I can't do anything with him down here.'
*127 "In the meantime I had smelled of his breath and there was quite an odor of alcohol, so I made up my mind that he was under the influence of alcohol, and before I would do anything I wanted him to tame down a little bit. They brought him up and I followed up.
"Q. How did they bring him up? Did he walk up the ladder himself? A. He got up and they helped push him up the ladder.
"Q. Did you go up yourself? A. Yes.
"Q. Did you notice whether there was any light on the ladder? A. Yes; enough so I could get up, anyway.
"Q. Did you have any difficulty seeing the light? A. No.
"Q. Well, they got him aboard? A. Yes. When they got him there they put him to bed and he refused to have me have anything to do with it. He was still using some pretty nice English, and I said: `I don't want anything to do with a man when I get up at two o'clock in the morning to help him and he refuses to let me do it.'
"Mr. Murray. I object to that.
"Q. Did you say that in the presence of Mr. Hooten? A. Yes.
"Q. What did you do then? A. Well, the men said they would hold him while I proceeded to examine him, and they did. There were four or five men got hold of him. The first thing I did was examine his eyes, take his pulse, and see if there was any serious head injury, and at the same time I sterilized my instruments to go ahead and proceed to sew up his scalp wound.
"Q. What was your conclusion, doctor, from your examination with regard to whether he had sustained any serious head injury? A. At that time I was not absolutely sure.
"Q. Go ahead, doctor. A. I did not think he had. I did not think there was any need of moving him. I thought it better for him to come out of his present condition. So I told him I would return a little later in the morning."
Dr. Smith called at the ship the next morning and testified as to Hooten's then condition:
"I asked him how he felt. He told me that his arm and leg hurt him quite a bit. I also asked him if he could remember the swipes at me the night before and talking the way he did, and he told me he could not; he could not remember a thing.
"So I went ahead. I let bygones be bygones. I did not care what he said to me. I knew he was not his normal self. And I told him to come down to the office the next day. Do you want me to go ahead?"
The next day Hooten came to the office of Dr. Smith, who further testified:
"At the time we got talking. In the conversation he said, `You will hear about this case in the future, doctor.'
"I did not like that very well, so I asked him what he meant. He said he wanted me to give him a break. When he got talking that way I considered it was about time I turned him over to the Marine Hospital.
"Q. Did you ask him what he meant by giving him a break? A. He wanted me to forget the fact I smelled alcohol on his breath, and on the trial he wanted me to testify as to his injuries.
"Q. Is that what he said or what you think? A. He told me to forget about the alcohol. The other thing is my own conclusion."
The District Judge found that Hooten was confused from drinking intoxicating liquor, though he did not make an express finding that Hooten was intoxicated.
He did find, however, that the libelant's falling from the ladder and his consequent injuries were not due to the unseaworthiness of the vessel, and that "his injuries were not due to the negligence of fellow servants or negligence of the owner, agent, servant or employee of the vessel."
We think the court may well have found, if it did not in effect find, that the libelant's injuries were due to his confused condition from drinking intoxicating liquors. It is clear, we think, that the evidence warranted such a finding, and this court so finds.
The District Court, therefore, erred in ruling that the libelant was entitled to maintenance and cure by reason of his injuries thus received.
It appears to be well-settled law that "sickness or injury occasioned by the seaman's own willful wrongdoing gives him no rights against the vessel or her owners." *128 Benedict on Admiralty (5th Ed.) Vol. I, § 83, page 132.
There is nothing better settled in the maritime law than that seamen are entitled to their wages with a reasonable allowance for their maintenance and cure, if taken ill, in the service of the ship or from being incapacitated from causes incident to their employment; but the right to maintenance and cure does not include liability for disease or injuries arising from his own vices or gross acts of indiscretion. This view is amply supported by the authorities. The Alector (D.C.) 263 F. 1007; Chandler v. The Annie Buckman, 5 Fed.Cas. 449, No. 2,591a; Pierce v. Patton, 19 Fed.Cas. 636, No. 11,145; Lortie v. American-Hawaiian S. S. Co. (C.C.A.) 78 F.(2d) 819; Meyer v. Dollar Steamship Line (C.C.A.) 49 F. (2d) 1002, 1003; The Coniscliff (D.C.) 266 F. 959. This last-cited case was reversed (C.C.A.) 270 F. 206, but on other grounds than the right of a seaman to recover for cure and maintenance where his sickness or injuries were due to a practice of his own vices.
This rule is found even in some of the earliest Maritime Codes; see Art. XVIII, Laws of Wisbuy, probably promulgated as early as the 13th century, printed in 30 Fed.Cas. p. 1191, and which provides:
"A mariner being ashore in the master's or the ship's service, if he should happen to be wounded, he shall be maintained and cured at the charge of the ship; but if he goes ashore on his own head to be merry, and divert himself, or otherwise, and happens to be wounded, the master may turn him off; and the mariner shall be obliged to refund what he has received, and besides to pay what the master shall be forced to pay over and above to another whom he shall hire in his place."
It is clear from the evidence that the libelant's injuries were the result of his excessive indulgence in intoxicating liquor while on shore. The vessel, therefore, is not liable for the maintenance and cure of the libelant by reason of his injuries thus received.
The decree of the District Court is affirmed as to the libelant's right to recover damages for his injuries, and is reversed as to his right to maintenance and cure, and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs to the appellant in both courts.