**PETTERSON LIGHTERAGE & TOWING CORPORATION v. NEW YORK CENTRAL R. CO.**

**No. 176.**

Circuit Court of Appeals, Second Circuit.

March 10, 1942.

---

Kenneth O. Mott-Smith and Jacob Aronson, both of New York City, for appellant.

Robert S. Erskine and Kirlin, Campbell, Hickox, Keating & McGrann, all of New York City (John F. Gerity, of New York City, of counsel), for appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree in the admiralty holding the New York Central tug "No. 32" solely liable for a collision between a loaded car float which she had in tow, and the tug "Bon" and a tanker which the "Bon" had in tow. The collision was in the East River off Pier 33 on the Manhattan shore; it took place after dark at about ten forty-five on the evening of July 30. The "No. 32" went into the Manhattan slip between Piers 34 and 35, picked up two car floats, one on either hand, and began to back out. Being bound for New Jersey, what she had in mind was to let the ebb—then at its full strength—carry down the stern of the tow as it emerged until it was parallel with the thread of the stream, and then to go ahead under a right rudder, turning to starboard and so downstream. The "Bon" with the tanker on her port hand was coming down the river on the tide; the forward end of the "No. 32's" starboard float struck and carried away her pilot house and by forcing her against the tanker, injured that vessel and did further damage to the "Bon" herself. Although the critical questions are in dispute, many of the facts are agreed upon. A Pennsylvania tow passed the slip as the "No. 32" was backing out, causing her to pause until it had cleared; and the "No. 32" did not see the "Bon" till it had done so. The "Bon" too did not make out the "No. 32" and her tow, until the Pennsylvania tow had crossed beyond the line of vision between them. At some time after the "Bon" saw the "No. 32" she blew her two blasts and put her rud-

der left, seeking to go over towards the Brooklyn shore. She was at once met by a single blast from the "Coney Island," a tanker coming up about 150 feet off the Brooklyn pier ends. The "Bon" answered this signal with one blast, and at once put back her helm; her two helm movements probably caused very little deviation from her original course. The "No. 32" answered the "Bon's" double blast by a double blast, but continued to swing to starboard, her explanation for this being that, when she got the "Bon's" signal, she was already headed too far to right of midstream to check her swing. Neither vessel had a look-out in the pilot house or at the bows; in each case the deckhand ordinarily detailed for that purpose was engaged elsewhere.

■ The turning point in the case is how far from the Manhattan shore the contact took place. The East River is about 1,200 feet wide at the locus in quo and the judge found that the bows of the "No. 32's" float were about in midstream—"at least 575 feet off the New York piers." Since the floats were by that time headed substantially straight across stream and were about 330 feet long, their sterns must have been some 250 feet from the pier-ends. We do not understand that the "No. 32" attempts to justify that position; but it is not of the slightest importance whether or not she does. Although her navigation was proper if it had been carried out reasonably close to shore, obviously it was inexcusable to take up half the river. The situation in The Fort St. George, 2 Cir., 27 F.2d 788, was so plainly different as to require no discussion. Moreover, the judge has found that when the "No. 32" saw the "Bon" and answered her signal she had not already swung so far to starboard that she could not check the swing by going forward under a left rudder. If that finding also should stand, obviously she was guilty of a second fault: having agreed to a starboard passing she did not do her duty. As to the faults of the "Bon" assuming she was in midstream, we can see none unless it be that, having blown a two blast signal, she did not keep on towards the "Coney Island" for a longer time, so as to give her a narrower berth than 350 feet. It is a little hard to be sure whether the "Bon" blew at once on seeing the "No. 32's" green light, but she must have seen the red light soon after, as she says she did, and it was cer-

tainly natural then to put her rudder left, even though a starboard passing presupposes that the vessels will clear without change of heading. It is probably true that she could have safely kept her rudder left longer than she did, and it is possible, perhaps likely, that if she had, she would have escaped. Nevertheless, we are not disposed to charge it as a fault against her that she did not. Faced at night with such unwarranted navigation as the "No. 32's," and warned—for it must be taken as a warning—by the "Coney Island" that her course was leading into the "Coney Island's" water, what was she to do? The result of an undisturbed study of all the facts as we now know them is not a fair standard to apply to her master; under familiar principles the "No. 32," which had so inexcusably forced the sudden choice upon her, is in no position to demand a perfect handling of so trying a situation. The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84. Both vessels were without lookouts at the time, but we are satisfied that in the case of neither did that have anything to do with the collision. Thus, as we have said, the case depends upon the place of collision, as it often does.

■ The testimony was in the usual conflict, though it is not to be ignored that the master of the "No. 32"—whom incidentally the judge did not credit anyway—swore before the Inspectors that the bows of his floats had reached, or had nearly reached, midstream. As to the probabilities, there are some on either side. On the one hand, it is strange that the "No. 32" had got herself so much further from the pier-ends than was necessary; the most reasonable explanation is that the master was inexperienced. On the other hand, it is unlikely for two reasons that the "Bon" should have been only 400 feet from the Manhattan piers: she would want to make use of the full strength of the ebb, and she would hardly have at once turned back at the "Coney Island's" signal, if there had been 600 feet between their courses. However, it is not important how we should have decided the issue on the cold record and without the benefit of the judge's finding. Even before the promulgation of Admiralty Rule 46½ in June, 1930, 28 U.S.C.A. following section 723 (281 U.S. 773) the decisions were legion that when a judge had seen and heard the witnesses his conclusions would prevail unless clearly

wrong. We had repeatedly so held. The Jersey City, 2 Cir., 51 F. 527. The Albany, 2 Cir., 81 F. 966, 968 (semble); The A. G. Brower, 2 Cir., 220 F. 648; The F. B. Squire, 2 Cir., 248 F. 469; Donovan v. New York Trap Rock Co., 2 Cir., 271 F. 308; The Perry Setzer, 2 Cir., 299 F. 586; United States Mexican Oil Corporation v. Pennsylvania R. Co., 2 Cir., 20 F.2d 385; The James McWilliams, 2 Cir., 42 F.2d 130; The Cullen No. 32, 2 Cir., 62 F.2d 68. And when the question came up after Rule 46½ was passed, express findings were naturally accorded the same finality as implicit findings had been given before. Lillig v. Union Sulphur Co., 9 Cir., 87 F.2d 277; S. S. Berwindglen, 1 Cir., 88 F.2d 125; Eastern Tar Products Corp. v. Chesapeake Oil Transport Co., 4 Cir., 101 F.2d 30; City of Cleveland v. McIver, 6 Cir., 109 F.2d 69; Commercial Molasses Corp. v. New York Tank B. Corp., 2 Cir., 114 F.2d 248, 250; The S. C. L. No. 9, 3 Cir., 114 F.2d 964; The S. S. Bellatrix, 3 Cir., 114 F.2d 1004; McAllister Bros. v. Pennsylvania R. R. Co., 2 Cir., 118 F.2d 45; Johnson v. Andrus, 2 Cir., 119 F.2d 287; United States Gypsum Co. v. Conners Marine Co., 2 Cir., 119 F.2d 689.

Formally, findings in the district courts were, it is true, an innovation in admiralty procedure in 1930, but in substance they were very old. During the period between 1789 and 1803, § 21 of the Judiciary Act, 1 St.L. 83, gave the right of appeal to the circuit court from decrees in admiralty of the district court where the amount was over $300; between $50 and $300 a writ of error alone was available (§ 22). Wiscart v. D'Auchy, 3 Dall. 321, 1 L.Ed. 619. But the Act of 1803, 2 St.L. at L. 244, changed this so that until 1875 all decrees were reëxaminable on the facts in the circuit court and indeed new evidence could be admitted. By § 1 of the Act of 1875, 18 St.L. 315, the circuit court was required to make findings of fact for use upon appeals to the Supreme Court, whose review was confined to questions of law; but the review upon appeal to the circuit court from the district court remained unchanged. The Act of 1891 establishing circuit courts of appeal, 26 St.L. 826, transferred to them the jurisdiction of the Supreme Court over appeals in admiralty; and we held in Munson S. S. Line v. Miramar S. S. Co., 2 Cir., 167 F. 960, that it repealed the provisions for findings of fact without imposing any similar duty on the district court, although its decisions on the facts continued to be open to review as they had been by the circuit court. Certainly no one has doubted since 1891 that the circuit courts of appeals have power to review the facts; but so they have in all other causes tried to a judge, and for that matter in causes tried to a jury. The question is not of the existence of such a power but of its limits. We are not entirely clear that the Ninth Circuit in The Ernest H. Meyer, 84 F.2d 496, meant to hold that upon admiralty appeals it had a broader power than it has under Rule 52(a), Federal Rules of Civil Procedure; but if so, we cannot agree. Much confusion has arisen, as we apprehend it, from the varying language which judges have used to describe what has now become the rubric of Rule 52(a). As we have said, the decisions are myriad in which findings of the district court have been in fact treated as final, but the locutions have varied by which the courts have described how far they thought themselves limited. We have gathered a number of these in the appendix annexed to this opinion; and an examination of them at once shows that they differ only in form from the phrase, "clearly erroneous," of Rule 52(a). All were designed to measure the reluctance of the appellate court to disturb what the trial court with its better opportunities had determined; and it is indeed at times possible to compare such reluctances when they imply a real difference in the temper of the approach; as for example that which protects a verdict, from that which protects the finding of a judge. But if one pretends to discover any difference between the degree of finality to be granted the findings of a judge sitting in admiralty and findings of the same judge sitting in equity or at law, the distinction breaks down into a verbiage which is not only inapplicable in practice, but positively mischievous in breeding confusion.

Alongside the change in this attitude of appellate courts towards the decision below, there has indubitably persisted the procedural principle that an appeal in admiralty results in a new trial, although the two are logically in plain conflict, for a really new trial should mean that all that has gone before has gone for nothing; and that was apparently exactly what

it did mean originally, as well in equity as in admiralty. Wiscart v. D'Auchy, supra, 3 Dall. 321, 327, 1 L.Ed. 619; United States v. Wonson, Fed.Cas. No. 16,750, 1 Gall. 5; Holdsworth Vol. I, 438 (1922); Vol. IX, 369 (1926). But as we have seen, beginning long before the creation of the circuit courts of appeal, an enormous body of authority has grown up which has changed the law and cannot now be denied. When therefore in 1930 the Supreme Court promulgated Rule 46½, it did no ·more than recognize an already thoroughly well established growth in customary law, for which it merely provided a means of better realization. It would now be as revolutionary to disregard this shift in admiralty as it would be in equity. Moreover, not much of any practical importance survives of the doctrine that an appeal in admiralty is a new trial. That part ·of it which occasioned our decision in Munson S. S. Line v. Miramar S. S. Co., supra, 167 F. 960, we have made obsolete by requiring an appellee to file assignments of error if he would challenge the decree (Rule 38(3), that part which should consistently absolve the appellant from giving a bond on appeal, we denied (not very logically, but because of the absurdity of not doing so) in Dobson v. United States, 2 Cir., 31 F.2d 288. See also Eureka Productions, Inc., v. Mulligan, 2 Cir., 108 F.2d 760, 761. That part which strictly should impose upon us the duty of deciding upon the record, although the district judge has made no findings, we overruled in Matton Oil Transfer Corp. v. The Dynamic, 2 Cir., 123 F.2d 999. Admiralty Rule 45 still remains but it has become substantially an anachronism. It allows evidence to be taken by leave of this court "in such manner as may be prescribed by statute or by said court." There is no "manner" consistent with Rule 46½ except to have the district judge take it, or at least to have it referred to him in the first instance after it has been taken. This is true because as soon as new evidence is taken the old findings are necessarily superseded; findings are not findings when they rest upon only a part of the evidence, and to satisfy Rule 46½ new findings must be made. Thus Rule 45 at most does no more than vest final discretion in this court as to whether new evidence shall . be taken at all, instead of merely a preliminary discretion as to whether that question shall be referred to the district court; surely this is a shadowy distinction. It would perhaps be too much to say that no vestige of the doctrine may still lurk in some cranny of the law, though we do not at the moment think of any; but certainly as to the question before us here, it is not only obsolete, but at war with all modern procedural tendencies which seek to center responsibility for the decision of the facts upon the trial judge. There cannot be the slightest question of the desirability of so doing; that complex of sight and sound, from which we make our conclusions in a courtroom, is in large part eviscerated when reduced to the printed word; and it is significant that the doctrine that an appellate court should review the facts was borrowed from the Civil Law where the testimony was all by deposition. It is a little curious that, although testimony in admiralty has been for so long taken orally in the district courts, recognition of the implications of the change was so long in coming, but procedure is often laggard, and after all, the change began nearly a century ago.

■■ The finding in the case at bar as to the position of the collision is unequivocal, but we wish to say a word as to the general form of it and the other findings. The judge wrote an opinion, discursive as an opinion should be, showing by what reasoning the evidence had brought him to his conclusions. In it he very properly did not separate the ultimate facts from their foundation or from the processes used to arrive at them; but the findings, obviously prepared by counsel, are not really findings at all. They are merely the opinion cut up into sections and numbered; they· add nothing to the original. Findings should not be discursive; they should not state the evidence or any of the reasoning upon the evidence; they should be categorical and confined to those propositions of fact which fit upon the relevant propositions of law. It is apparently impossible to expect this from counsel; and we are indeed aware that the requirement adds perceptibly to the judge's labors. Nevertheless, we are not convinced that if prepared along with the opinion, if limited in number to disputed issues, and if confined to the ultimate facts, their preparation will prove as serious a burden as is sometimes supposed; and certainly, if so prepared, they will prove of much value in the administration of justice, and will incidentally greatly increase the finality of the decisions

of the district court. United States v. Forness, 2 Cir., 125 F.2d 928.

Decree affirmed.

APPENDIX

*Cases Divided Before Rule 46½ Was Promulgated.*

The Grafton, C.C.S.D.N.Y.1846, Fed. Cas.No.5,655, 1 Blatchf. 173

"To warrant a reversal upon a mere question of fact, the preponderance of the evidence should be of a somewhat decided character; such as would justify the granting of a new trial in a court of common law, on the ground that the verdict was against the weight of evidence."

Baker v. Smith, C.C.Mass.1872, Fed. Cas.No.781, 1 Holmes 85

"It will not do to show that on one theory, supported by some witnesses, a different decree might have been rendered, provided there be sufficient evidence, to be found in the record, to establish the one that was rendered."

Levy v. The Thomas Melville, C.C. N.Y.1888, 37 F. 271, 272

"A proper appreciation of the appearance of the witness on the stand, and of the manner in which he gave his evidence, will in such cases lead the mind to an assured conclusion. From the application of this test, the reviewing judge is debarred."

The Parthian, C.C.Mass.1891, 48 F. 564

"It is the established rule of this court that it will not reverse the conclusion reached by the district court upon a controverted question of fact, where the evidence is contradictory, unless it clearly appears to be contrary to the preponderance of evidence."

The Alijandro, 9 Cir., 1893, 56 F. 621, 624

"The rule is well settled that in cases on appeal in admiralty, when the questions of fact are dependent upon conflicting evidence, the decision of the district judge, who had the opportunity of seeing the witnesses and judging their appearance, manner, and credibility, will not be reversed unless it clearly appears that the decision is against the evidence."

The City of Naples, 8 Cir., 1895, 69 F. 794, 796

"the decree of the district judge * * * will not be reversed unless the appellate court can clearly see that the decree was against the weight of evidence."

City of Cleveland v. Chisholm, 6 Cir., 1898, 90 F. 431, 434

"the rule prevails that the judgment of the district court will not be reversed when the result depends alone upon questions of fact depending upon conflicting evidence, unless there is a decided preponderance against the judgment."

The E. Luckenbach, 4 Cir., 1899, 93 F. 841, 842, 843

"Unless we find from the record that the decision is clearly against the evidence, we will not—as the questions of fact are to be ascertained from conflicting testimony— reverse the decree of the judge."

The Oscar B, 9 Cir., 1903, 121 F. 978, 981

"While this court is not limited to the review of questions of law, only, in admiralty appeals, it is nevertheless the settled practice to give great weight to the findings of fact by the trial judge, and not to disturb such findings, in cases of conflicting testimony, unless they are found to be clearly against the weight of the evidence."

Memphis & Newport Packet Co. v. Hill, 8 Cir., 1903, 122 F. 246, 247

"This finding is amply supported by testimony, and we accordingly adopt it, as we have frequently held that we will do where the evidence is fully adequate to sustain a finding made by the lower court or by a master, and no serious mistake seems to have been made by the trier of the fact in the consideration of the evidence."

Paauhau Sugar Plantation Co. v. Palapala, 9 Cir., 1904, 127 F. 920, 924

"in cases on appeal in admiralty * * * the decision of the district judge * * * will not be reversed unless it clearly appears that the decision is against the evidence."

Baton Rouge & B. S. Packet Co. v. George, 5 Cir., 1904, 128 F. 914, 915

"the learned District Judge * * * has found that the contract was proved * * *. To now hold otherwise would be merely to substitute our conclusion on evidence for that of the District Judge."

Royal Exchange Assur. v. Graham & Morton Transp. Co., 7 Cir., 1908, 166 F. 32, 36

"The finding of such ultimate fact * * * will not be set aside unless it clearly appears that the conclusion is either unsup-

ported by the evidence or against the evidence."

The A. G. Brower, 2 Cir., 1915, 220 F. 648, 649

Findings will be accepted "unless the appellate court is well satisfied that they are contrary to the weight of evidence."

Erie & M. Ry. & Nav. Co. v. Dunseith, 6 Cir., 1917, 239 F. 814, 816

"This conclusion of the District Judge that the steamer was so in fault, reached after a hearing of the character stated, should be accepted by us, unless the evidence clearly preponderates against it."

The F. B. Squire, 2 Cir., 1917, 248 F. 469, 470

Findings are "not to be set aside unless certainty of error can be asserted."

American Merchant Marine Ins. Co. v. Liberty S. & G. Co., 3 Cir., 1922, 282 F. 514, 518

"although in an appeal in admiralty we are required to consider the testimony de novo, we are called upon to observe the rule that findings of fact by a trial judge who saw and heard the witnesses will have great weight with an appellate court and will not be disturbed unless they are clearly against the evidence."

The Kearney, 3 Cir., 1926, 14 F.2d 949, 950

"A fact found by the trial judge, who saw and heard the witnesses, should not be disturbed by an appellate court, unless the error is manifest and clearly against the evidence."

The William A. Paine, 6 Cir., 1930, 39 F.2d 586, 588

"It is well settled in this and other circuits that, in an admiralty case in which the testimony is contradictory and the

exact facts difficult to ascertain, the findings of the District Judge who heard and saw the witnesses will be accepted, unless clearly against the weight of the evidence."

The Ellenville, 4 Cir., 1930, 40 F.2d 47, 48

"Where the trial judge decides the case on oral evidence, his conclusion should be accepted on appeal unless clearly wrong."

*Cases Decided After Rule 46½ Was Promulgated.*

Lillig v. Union Sulphur Co., 9 Cir., 1937, 87 F.2d 277, 278

Findings "should not be upset, except for manifest error or unless it is shown that they are clearly wrong."

S. S. Berwindglen, 1 Cir., 1937, 88 F.2d 125, 126

Findings "will not be disturbed unless clearly wrong."

Eastern Tar Products Corp. v. Chesapeake Oil Transport Co., 4 Cir., 1939, 101 F.2d 30, 33

Findings "will not be changed by an appellate court unless clearly wrong."

City of Cleveland v. McIver, 6 Cir., 1940, 109 F.2d 69, 71

Findings will be accepted "unless clearly against the preponderance of the evidence."

Commercial Molasses Corp. v. New York Tank B. Corp., 2 Cir., 1940, 114 F.2d 248, 250

"We cannot say that the finding was 'clearly erroneous.' "

The S. C. L. No. 9, 3 Cir., 1940, 114 F.2d 964, 966

"Such findings should, therefore, not be set aside on appeal except upon a showing that they are clearly wrong."