324 F.2d 237
 Morton K. LANGE, Appellant,
v.
LIBERTY NATIONAL INSURANCE COMPANY, a corporation, Appellee.
LIBERTY NATIONAL INSURANCE COMPANY, a corporation, Cross-Appellant,
v.
Morton K. LANGE, Cross-Appellee.
 No. 18226.
 United States Court of Appeals Ninth Circuit.
 November 5, 1963.
 Rehearing Denied December 11, 1963.
 
 Thomas A. Mitchell, Coeur d'Alene, Idaho, for appellant.
 Morton K. Lange, St. Louis, Mo., in pro. per.
 McNaughton & Sanderson, and H. S. Sanderson, Coeur d'Alene, Idaho, for appellee.
 Before CHAMBERS, Circuit Judge, MADDEN, Judge of the Court of Claims, and BROWNING, Circuit Judge.
 MADDEN, Judge.
 
 
 1
 The plaintiff, Morton K. Lange, sued the defendant, Liberty National Insurance Company, because, he alleged, it illegally came into possession of $50,003.00 which he paid to a trustee pursuant to an escrow agreement for the purchase of stock in the defendant company. The plaintiff alleged in his petition that he had attached certain conditions to his subscription and payment to the trustee, and that, although those conditions were agreed to by the defendant and were never fulfilled, the defendant took the plaintiff's money and has refused to return it. The plaintiff's payment to the trustee was made on or about January 8, 1957, and the money was turned over to the defendant on January 18 and 21.
 
 
 2
 Certain facts relating to the plaintiff's relation to the defendant company are pertinent. Early in 1955 the plaintiff was looking about for an insurance company that would write insurance for United States military personnel in Europe, principally in Germany. He desired to be, personally or through a corporation, the selling agent for such insurance. He formed a corporation, Transatlantic Casualty Underwriters, Inc., wholly owned by himself, to be such an agent. His corporation made an agency agreement with the defendant on September 1, 1955, and proceeded to sell the defendant's insurance, or at least its automobile liability insurance, in Germany.
 
 
 3
 In August of 1956 there was a meeting in Minneapolis, Minnesota, at which the plaintiff, a Mr. Chapman who was the vice president of the defendant, and others, were present. One of the problems considered was the obtaining of International Green Cards, apparently a kind of evidence required by European countries, of motorists traveling in or through those countries, to show that the motorist was insured by a responsible company. It seems that the defendant company, perhaps because it was a small company, was not authorized to issue such cards, but might be able to obtain them through another company. Another problem discussed was that of obtaining permission for the plaintiff's agency to sell the defendant's insurance in European countries other than Germany. Chapman gave the plaintiff the impression that these problems would be taken care of. The plaintiff then returned to Germany.
 
 
 4
 On September 25, 1956, at the request of the board of directors of the defendant, the District Court of the State of Idaho entered an order placing the defendant company in rehabilitation, a form of receivership used to conserve the assets of an insurance company for its policy holders. By this action, the officers and directors of the defendant were enjoined from taking any action with respect to the affairs of the defendant without the written consent of the appointed rehabilitator, who was a Mr. Albertson.
 
 
 5
 The plaintiff heard, during the autumn of 1956, of the financial difficulties of the defendant. On December 7 he learned of the rehabilitation proceedings. He immediately went to Coeur d'Alene, Idaho, where the defendant company was located. When he arrived there on December 12, he, as he states in his brief, "learned that the company was facing imminent liquidation."
 
 
 6
 The plaintiff was anxious to keep the defendant company alive. He testified that the financial collapse of the defendant company would have created a notorious scandal, involving himself, the United States Army which had cooperated with him in obtaining liability insurance for military personnel, and the United States itself. The plaintiff was also apparently making money out of the sale of the defendant's policies. He was willing and anxious to put money into the defendant company if that would keep it alive.
 
 
 7
 Two days before the plaintiff's arrival at Coeur d'Alene, there was a meeting of the shareholders of the defendant, at which they agreed to pool their 60,000 shares and let 36,000 of them be sold at $7.75 a share. The agreement provided that if sufficient funds to forestall liquidation had not been raised under this plan by January 2, 1957, the plan would be abandoned and the stock and money returned.
 
 
 8
 During his stay in Coeur d'Alene from December 12 to December 22, 1956, the plaintiff discussed with the rehabilitator Albertson the reason for the company's financial difficulties, the need for new management, a financial statement which was then available, and the prospects of continued operation. The plaintiff testified that he knew at that time that the defendant was in bad financial condition. However, before he left Coeur d'Alene on December 22, he gave Albertson a check for $50,000 and a note for $50,000 which Albertson was to hold until the plaintiff returned after the holidays. He returned on January 2, 1957. He met with Albertson, Chapman and Roost, a representative of the defendant's re-insurer, who had the contacts needed to obtain the green cards. The plaintiff was told that the green cards would be available.
 
 
 9
 On January 5 Albertson, at the direction of the Insurance Commissioner of Idaho, rejected the plaintiff's proposal of December 22, 1956, to buy $100,000 worth of the company's shares. The reason apparently was that an insurance company should not be controlled by one of its agents. Albertson advised the plaintiff that he would be receptive to other proposals. The plaintiff then gave Albertson a letter which set out the conditions on which he would invest either $50,000 or $100,000 in the defendant's stock. The plaintiff says that Albertson accepted the conditions. Albertson denied that he had, and the district court believed Albertson.
 
 
 10
 At meetings of the board of directors on January 8 and 9, the plaintiff was made a director and president of the defendant company. As president, or chairman of the board, the plaintiff wrote and signed letters to those who had subscribed for stock under the December 10, 1956, plan, telling them that the plan was modified to require $100,000 paid in capital for continued operation, and without the lifting of the rehabilitation order, that the January 2, cut-off date for new purchase of stock was advanced to March 15, and that those who had subscribed could get their money back if they requested it by January 18. The plaintiff, as president of the defendant, also wrote letters to the company's agents telling them that the first steps in rehabilitation had been taken. He wrote a recommendation to the board of directors and the Executive Committee as to the management of the company. He paid $50,003 to the trustee who was receiving the subscriptions and money, for 6452 shares of stock at $7.75 per share. Also, on January 11 the agency contract of the plaintiff's corporation was extended through the year 1957, and was made to cover the writing of automobile insurance in France, Spain and Italy, in addition to Germany.
 
 
 11
 The plaintiff left Coeur d'Alene on January 14 and returned to Germany. About January 18, the Insurance Commissioner directed the trustee who held the money under the subscription agreements to turn the money over to the defendant. That was done, and the money was immediately used to pay the defendant debts.
 
 
 12
 Albertson in February advised the plaintiff in Germany that the management was pressing every possible source of refinancing. He enclosed the certificates for the stock which had been subscribed for, including the $50,000 worth of stock which the plaintiff had subscribed for, for the plaintiff's signature as president. The plaintiff, after some delay, signed and returned the certificates. In the meantime, beginning early in January, Chapman and Albertson, with the knowledge and consent of the plaintiff, had been corresponding with one Becher, who represented clients interested in purchasing all the unsold shares of the defendant. These conversations were known to the plaintiff from their inception. On his way back to Germany he stopped in New York and discussed the problem with the Becher interests. Thereafter he repeatedly reassured the Becher interests and Albertson that he had no objection to their buying a controlling interest in the defendant if the other stockholders were agreeable.
 
 
 13
 In April, 1957, the Becher interests bought all of the unsold shares, amounting to 38,377 shares, paying the same price, $7.75 per share, which the plaintiff and other subscribers paid for their shares. The Becher investment was some $300,000. The Becher interests elected directors and officers of their choice. The Becher investment put the defendant company in such a financial position that in May the rehabilitator, Albertson, filed in the State district court of Idaho, which had put the defendant company in rehabilitation, a motion for a hearing on termination of rehabilitation. Statutory notice of the hearing was given to all stockholders, including the plaintiff. No one having objected, the court ordered that the rehabilitation be terminated. The defendant insurance company was again in a position to operate independently under its own management.
 
 
 14
 It would seem, from the foregoing recital, that the plaintiff's objective of saving the insurance company from which he earned commissions had been accomplished. On November 6, 1957, the plaintiff gave his proxy for his shares to the Becher interests to vote at an impending stockholders' meeting.
 
 
 15
 First on August 7, 1958, and more formally on December 31, 1958, the plaintiff demanded of the defendant the return of his $50,003.00. These demands were refused. In June of 1958 the plaintiff had terminated the agency agreement of his Transatlantic corporation, but the parties, after a conference, kept the agency agreement in operation until June 30, 1959, when the plaintiff terminated it. The instant suit was thereafter brought by the plaintiff.
 
 
 16
 Though it is not developed in the record, one may infer that the defendant company, though the Becher interests have financed it with additional large sums of money, has not prospered. The plaintiff says that his stock in the defendant company is worthless. If that is the fact as to the plaintiff's stock, it is the fact as to the stock of the Becher interests who invested many times as much in the stock as the plaintiff did, and it is the fact as to the other investors.
 
 
 17
 We agree with the District Court that there is no merit in the plaintiff's claim. He was aware, before his investment, of the precarious financial condition of the company. He put his money into it to help save it from liquidation, to save his agency which must have been profitable, since he was so anxious to save it, and to save his reputation from the scandal of having sold insurance policies of a company which defaulted on its claims. He makes much of the fact that his money paid to the trustee was covered into the treasury of the defendant and used to pay its bills before the March date set in the revised agreement for doing that. He was the president and a director of the defendant company. He was in Germany and the company was in Idaho. It had, as he knew, insufficient money to pay the claims and bills accruing against it. He would have the court believe that he, the president of the company, intended to have his money kept segregated in the hands of the trustee while the money of the other subscribers was used to keep the company alive while Albertson, the rehabilitator, was, as the plaintiff knew, diligently and with ultimate success, seeking to find additional sources of money to make it proper for the court to terminate the rehabilitation proceeding. After the March 15 deadline had passed, the plaintiff, as president of the company, signed certificates of stock to be issued to himself and the other subscribers. Was he to own the stock without paying for it?
 
 
 18
 The plaintiff purports to see fraud in every representation made by him by the rehabilitator or anyone connected with the defendant, at the time in December, 1956, and January, 1957, when he and the rehabilitator and the stockholders were trying to save the company. He says in his brief that he was given an estimate that when the complete figures for December, 1956, were in there would be a policyholders' surplus of $17,000. He was a lawyer, a former judge, and the owner of an insurance agency. He must have known that what that figure showed was that at best the company was operating on a shoestring, that if the December claims turned out to be unfavorable, the company could not pay them, that if the future experience of the company followed the same path, the company was doomed unless it was refinanced and reformed. He was anxious to save his agency and was hopeful, as the other investors were, that the company could be made into a profitable venture. But he has no basis for claiming that he was misled by rosy representations made to him by others.
 
 
 19
 Many of the items alleged by the plaintiff to have involved fraud or misrepresentation had to do with events occurring after the plaintiff had paid his money and received his stock. There was difficulty about having the green cards available at all times. It was not possible to get the green cards unless some other company was willing to furnish them. That was a matter completely beyond the control of the defendant company, as the plaintiff well knew. There is no evidence that the defendant was not diligent in its efforts to keep green cards available. The plaintiff complains that the defendant sought to reduce the rate of commissions payable to the plaintiff for selling the defendant's insurance. Whether it could do so or not depended, of course, on what the agency contract provided, and for how long it bound the parties. The fact that the plaintiff had bought some stock in the defendant company did not give him a right to perpetually dictate the terms of the contracts which the defendant would make with him.
 
 
 20
 The plaintiff complains that the district judge did not make findings in compliance with Rule 52(a) of the Federal Rules of Civil Procedure. In the instant case, in which the plaintiff made numerous charges of fraud and misrepresentation, and the court concluded that he had not proved them, it would have been improper for the court to recite the evidence which had led it to the conclusion. Petterson Lighterage & Towing Corp. v. New York Central R. Co. (C.C.A. 2) 126 F.2d 992. We find no violation of Rule 52(a).
 
 
 21
 The defendant filed a cross claim against the plaintiff in the district court. The basis of this cross claim was that the plaintiff's wholly owned corporation, Transatlantic Casualty Underwriters, Inc., had collected premiums on the sale of the defendant's policies in Europe, and had not paid them over to the defendant. The defendant urged in the district court that Transatlantic was simply the alter ego or instrumentality of the plaintiff, and that the defendant's claim for these premiums should be enforced against the plaintiff in the instant action. The district court made findings that Transatlantic was an entity separate and apart from the plaintiff and was not a party to the instant suit. It ordered dismissal of the defendant's cross claim against the plaintiff. We think the question is a close one, but we do not disturb the findings and order of the district court.
 
 
 22
 The order of the district court dismissing the plaintiff's suit is affirmed.
 
 
 23
 The order of the district court dismissing the defendant's cross claim against the plaintiff is affirmed.