**P. DOUGHERTY CO. v. S. S. MAN-CHESTER EXPORTER et al.**

**MANCHESTER LINES, Limited, v. THE IVANHOE et al.**

**No. 198.**

Circuit Court of Appeals, Second Circuit.

Feb. 11, 1944.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Robert S. Erskine, of New York City, of counsel), for appellant.

Foley & Martin, of New York City (James A. Martin and Christopher E. Heckman, both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

On July 13, 1942, at about ten o'clock in the morning of a clear day, the libellant's tug Ivanhoe with a sea going barge loaded with coal in tow alongside on her starboard was in collision with the S. S. Manchester Exporter, owned by the claimant and cross-libellant, in the Chesapeake & Delaware Canal off Biddle Point. The tug and the steamer were both considerably damaged and the barge received comparatively slight injuries. The tug sued the steamer, whose claimant, Manchester Liners, Ltd., answered, denying any fault and alleging that the collision was caused by the negligent navigation of the tug. A cross-libel to recover the damages sustained by the steamer was also filed against the tug, whose claimant, The P. Dougherty Company, answered denying any fault on the part of the tug. On the issues thus joined, trial was had on the libel and the cross libel in the District Court for the Southern District of New York. The libellant's witnesses testified in open court, and those for the steamer gave evidence by deposition. A short oral opinion was delivered by the trial

judge at the end of the hearing, and subsequently findings of fact and conclusions of law were filed, which were followed in a decree exonerating the tug and holding the steamer solely at fault. The claimant of the steamer and cross-libellant have appealed.

■ It has been earnestly argued by the appellant that, because the judge did not receive in evidence the entire depositions but permitted each party to read from them whatever portions each wanted to have appear in the record, such a disconnected presentation of the steamer's case was made that the judge became confused as to the facts and indicated as much in his oral opinion. For this reason, among others, it was insisted that the real issues are broader than ordinary questions of fact in an appeal from a decree in admiralty and that they are matters which cannot properly be resolved by an application of our established rule that the findings in such cases are to be accepted and given effect unless clearly erroneous. See, Petterson Lighterage & Towing Corp. v. New York Cent. R. Co., 2 Cir., 126 F.2d 992.

■ There certainly was no error in dealing with the depositions in the way above stated, since neither party was refused the right to read into the record any pertinent portions of any of them; and, if the judge's oral opinion did not deal adequately with all the evidence as it bore upon the issues, his findings and conclusions, filed later, were comprehensive enough. As will be seen, the evidence fully supports them though it is conflicting as might be expected. As the conclusions of law are properly drawn on the facts so established and as they support the decree, this appeal involves only disputed questions of fact and comes within the rule of the Petterson case, supra.

The tug Ivanhoe, 142 feet long, 27.5 feet wide and 14.8 feet deep, had the ocean going barge Frederick tightly lashed to her starboard so that the bow of the tug was just aft of amidships of the barge and was pointed slightly toward it. The barge, being 267.3 feet long, extended a considerable distance ahead of the tug. It was 46 feet wide and 23.6 feet deep and had its own steering apparatus. The steamer was 435 feet long, 55.5 feet wide and 36.4 feet deep. The canal runs generally east and west though there are local changes of direction at turns, of which there is one at Biddle Point where the collision occurred. It is there 250 feet wide, and the bight of the bend is on the south side of the canal near the mouth of an inlet called Scott Run.

The steamer was going west against a flood tide running about a knot and was making about five knots over the ground. She had an assisting tug, the Atkins Hughes, on her port side. She was favoring her right hand side of the canal, and when about half a mile east of Biddle Point she saw the Ivanhoe and her tow approaching the Point from the west at about the same speed. She then blew one blast to the Ivanhoe which promptly answered with one blast. The conflicting evidence has to do with what then occurred up to the time and place of collision, but it is undisputed that the stern of the steamer and the port side of the tug came together with such force that the tug was torn from her tow. The tow drifted on with the tide until she was later picked up by the tug, apparently without having run aground, because her own steering apparatus prevented it, though there is some evidence that she did ground before being picked up.

The evidence of the steamer now relied on by its claimant is that after she blew the one blast she slowed and turned even closer to the north bank of the canal. She then got so close that she touched bottom near the starboard bow, as was shown by damaged plates found when she was later in dry dock at Manchester, England, in corroboration of her witnesses who so testified. While still very close to the north bank and hardly moving at all the tug and tow came on without turning to the right after answering the one blast signal and without slackening speed, but apparently out of control with the bow of the tug pointed toward the south shore and the vessels moving "crab like" toward the stem of the steamer and on the steamer's side of the center of the channel. When the collision was imminent, the steamer dropped her starboard anchor, went full speed astern and was struck by the tug despite her own efforts to avoid collision and the pushing of her helper tug on her port bow. Just before the collision that tug slacked off and dropped back out of danger.

■ The version of the tug is quite different. Its evidence was that it was at all times both under control and on its right hand side of the center of the channel. When it answered the steamer's signal it kept on well over toward and to within ten feet of the south shore to enable it to pass

574

the steamer safely as it had passed several other steamers in the canal that morning. It maintained its speed of about five knots over the ground in order to navigate properly while running with the tide. When it was about to pass the steamer, the latter took a sheer to port which the tug's captain thought she and her helper tug would be able to break. Just before the collision he saw that he was mistaken and put on speed in an effort to get clear, but it was in vain and the collision occurred. Though the captain of the steamer and the others of her crew who testified denied that his ship took a sheer, the canal pilot on the steamer directing her navigation testified to the contrary when examined by the local inspectors in the absence of any representative of either the steamer or the tug. He had previously filed a report to the inspectors in which he seems to have said nothing about a sheer, though the entire report is not contained in this record, and had stated that the tug and her tow "were approximately 75 feet north of midchannel" shortly before the collision. He said much the same thing when the inspectors examined him. He was then asked, "Would you say that the bow of your vessel sheered towards the tugboat just before the collision occurred?" His reply was, "Yes, I'll say that because it's truth. She veered off I should say 35 or 40 feet. I think it was a little to the right near to the center of the channel but not beyond the center of the channel." He was also asked, "Do you think if the vessel hadn't sheered, the collision would have occurred?" To that he replied, "No, sir." The master of the Atkins Hughes was also examined by the inspectors and testified that the steamer sheered to the left just before the collision and that, though he tried to push her bow to starboard, he was unable to break the sheer. Of course the pilot was making no admission against his own interest when he acknowledged that the steamer sheered and may well have thought that he could forestall any criticism of himself by accounting in that way for the movement of the ship. However that may be, the master of the Atkins Hughes was under no urge for self-excuse. From all this it is plain enough that it was not clearly erroneous for the trial judge to believe the evidence of the Ivanhoe and to base his findings as he did, inter alia, that at the time of the exchange of the one blast signal the Ivanhoe "was about in the center of the Canal and pulled over to her right hand side and

continued along her right hand side," and also that, "The sheering of the Manchester Exporter was the sole cause of the collision."

As findings, supported by adequate evidence, show that the Ivanhoe was always on her right hand side of the canal after the exchange of signals and the vessels did collide, it is inevitable that the sheer of the Manchester Exporter took her over into the Ivanhoe's waters. Though there is no express finding to that effect the fact is inherent in the findings made.

Decree affirmed.