## C. J. DICK TOWING CO. et al. v. THE LEO et al.

## COMMERCIAL PETROLEUM & TRANSPORT CO. et al. v. TEXAS CO. et al.

### THE DISPATCH.

No. 13987.

United States Court of Appeals
Fifth Circuit.

March 12, 1953.

Robert Eikel, Royston & Rayzor, Houston, Tex., for Commercial Petroleum & Transport Co., and John R. Francis, trustee.

Carl G. Stearns, Houston, Tex., Fulbright, Crooker, Freeman & Bates, Houston, Tex., of counsel, for C. J. Dick Towing Co.

Benjamin W. Yancey, New Orleans, La., Clarence S. Eastham, Houston, Tex., Terriberry, Young, Rault & Carroll, New Orleans, La., of counsel, for Texas Co.

Before HUTCHESON, Chief Judge, and BORAH and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This appeal is in admiralty from a final decree holding appellant, C. J. Dick Towing Company, solely liable for damages resulting from a collision in the Bayou Boeuf section of the Gulf Intra-Coastal canal near Morgan City, Louisiana, between the tow of appellant's Tug Dispatch and the tow of the Tug Leo, owned by appellee, Commercial Petroleum and Transport Company.

On the morning of November 28, 1947, at about 7 a. m., the Tug Dispatch was under way in an easterly direction from Port Neches, Texas, to Mount Vernon, Indiana, via the Intra-Coastal Canal. She was pushing ahead of her three loaded gasoline barges, with the Bascom W. Smith in the lead, the Barge NBC 486 in the middle and the Barrett J. Woods next to the tug.

The Tug Leo was then proceeding in a westerly direction on Bayou Boeuf enroute from Baton Rouge, La., to Mermentau, La., towing astern the three unloaded oil barges BA–24, BA–22 and BA–23, in that order. When the two tows approached each other, signals were exchanged for a starboard to starboard passing, and in executing the passage agreed upon, the lead barge, Bascom W. Smith, of the Dispatch tow, collided with the stern barge, BA–23, of the Leo tow, causing the barge Bascom W. Smith to explode and catch on fire and the barge Barrett J. Woods to catch afire, seriously damaging both barges and their cargo. The barge BA–23 was also damaged, along with the derrick barge 444 belonging to Bozeman & Gray, owners of a nearby shipyard.

At the time of the collision, the weather was clear, visibility was good, and there was a westerly current of about 2½ to 4 miles per hour. The wind was blowing from the north at about 15 to 20 miles per hour. The collision occurred along a bend or turn where the channel of Bayou Boeuf was about 300 feet wide.

Four suits were filed as a result of the collision and were by agreement consolidated and tried together.[1] In the main suit involving fault for the collision, the district court found that the Tug Leo had "faithfully and fully performed" her duty of maintaining the south bank of the canal so that the starboard to starboard passing could be safely executed;[2] that the Tug Dispatch and her tow were solely at fault in permitting the tow "to sag across the canal in the direction of the Tug Leo and her tow", and in failing to maintain an attentive lookout or stop and blow the danger signal when danger of collision became apparent. With reference to the claim of The Texas Company for the value of its gasoline cargo being transported in two of the barges in the Dispatch tow at the time of the collision, the district court concluded that the unseaworthy condition of the Dispatch and her tow entitled The Texas Company under its Transportation Agreement[3]

1. A statement of the nature of these four suits is contained in the opinion of the district court reported at 98 F.Supp. 455, 456, and need not be repeated here.

2. In this connection, the district court further observed that "with the three empty barges and the 15 or 20 mile per hour north wind, I am doubtful if it would have been possible for the Leo and her tow to be elsewhere in the canal."

3. The following provisions of the "Transportation Agreement", dated March 17, 1947, between The Texas Company and

852

to recover from the Tug Dispatch, her barges, and C. J. Dick Towing Company, her owner, all damages to the cargo caused by the collision, fire and explosion.[4]

Appellant, C. J. Dick Towing Company, in urging us to review the facts *de novo*, argues that the testimony fairly establishes that the collision and resulting damage was caused by the negligence of the Tug Leo and its tow; that as the Leo proceeded to her left around the bend of the canal her

barges astern naturally swung to starboard toward the north bank and across the path of the Bascom W. Smith, the lead barge of the Dispatch tow, while the Dispatch and its tow were only some 40 or 50 feet from the north bank and on their proper side of the channel.

Appellee, Commercial Petroleum and Transport Company, contends that the testimony reveals, and the district court correctly found, that the collision resulted

---

this appellant (Ex. 38) are pertinent to the claim of The Texas Company:

"*Jason Clause:* In the event of accident, danger, damage or disaster before or after commencement of a voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, Dick is not responsible by statute or contract, or otherwise, the shippers, consignees or owners of the cargo shall contribute with Dick in general average * * *.

"*Force Majeure:* The obligations of this Contract are mutually contingent upon Acts of God, perils of the waters, strikes, fire, explosion, perils of navigation, * * *, and all other interferences, similar or dissimilar beyond the control of the parties.

"*Release:* The transporting of the cargo under this Contract is undertaken at the sole risk of the cargo carried, insofar as loss or damage to such cargo is concerned, and neither the vessel, towboat, tugboat, barges or other equipment used or employed by Dick in the performance of their obligations hereunder, nor Dick, shall be liable for any loss of or damage to such cargo, unless due to negligence on the part of Dick and/or their servants in the handling, care and custody of the cargo and provided also that Dick shall have exercised due diligence to make such vessel, towboat, tugboat, barges and other equipment seaworthy and capable of performing the voyage they are to undertake."

4. As to the negligence of the crew of the Tug Dispatch and her tow and their unseaworthy condition prior to and at the time of the collision, the district court summarized the evidence as follows [98 F.Supp. 458]:

"The evidence makes it clear and I find that the explosion on the Barge Bascom W. Smith immediately or soon after the collision was in the forward rake tank of the Smith. No cargo was being carried in such rake tank, and it was either

not gas free or there was a leak of gasoline into it from the tank which contained gasoline cargo, or it contained some other explosive. The inspection of this rake tank both at the time the Barge Bascom W. Smith was loaded and at the beginning of the voyage at Port Neches and later at the time the tow or a part of it was aground was not at all adequate and meant practically nothing. I feel sure and find that the right kind of inspection at Port Neches of such rake tank would have disclosed that it was not gas free or that gasoline could leak or was leaking into it from the cargo tank or that it contained some other explosive. I think and find that those in charge of the Dispatch and her tow were negligent in not properly inspecting the tow and in allowing this rake tank to be in such condition as to be, as it was, a menace and hazard. It is clear and I find that the Dispatch and her tow were not seaworthy when they were loaded and left Port Neches at the beginning of the voyage, and continued unseaworthy up to the time of and after the collision. There is no diligence shown in making them seaworthy. They were negligently allowed to remain unseaworthy.

"It is worthy of note that the explosion caused by the condition of such rake tank started the fire that caused the major portion of the damage to everyone concerned. Had it not been for the explosion and fire, the mere collision of the two barges would likely have caused little damage.

"Further, I think the Dispatch and her tow or barges were unseaworthy in another respect or for another reason. Considering the manner the Captain and Crew inspected such rake tank at the beginning of the voyage and at and after the grounding, and the manner in which they handled the Tug and tow before and at the time of the collision, I seriously doubt their competency and efficiency. I find that their competency and efficiency have not been satisfactorily shown."

from the failure of the Dispatch and her tow, through negligent navigation and the inattention of its lookout, to carry out the starboard to starboard passing agreed upon; that such passing was the only safe passing which could have been effected under the circumstances because the Leo's empty barges were being blown toward the south bank of the canal by the north wind; that prior to and at the time of the collision the Leo and its tow were well over on their south side of the channel to effect such passing and their barges were hugging the south bank; that at the time the signals for passing were exchanged and on up until the time of the collision, the forward tow of the Tug Dispatch was being pushed at an angle toward the south side of the channel, with its lead barge, the Bascom W. Smith, extending over on the Leo's south side of the channel; that the passing would have been executed safely but for this failure of the Dispatch to keep its barges over on the north side of the channel and clear of the stern barge of the Leo.

Appellee, The Texas Company, assigns error principally in the failure of the district court to hold the Tug Leo and her tow equally at fault for the collision, and asserts that its damages should have been equally divided between the two tugs and their tows; alternatively, it is argued that since the fault of the Dispatch "is palpable and obvious" and the unseaworthy condition of its tow conclusively shown, the district court correctly held The Texas Company entitled to recover from appellant, C.

J. Dick Towing Company, the value of its damaged cargo.

The cross-appeal of Commercial Petroleum and Transport Company and its trustee assigns error only as to the assessment of costs against that company by the district court, as petitioner in the limitation proceeding below.

 In reviewing the factual issues presented by this voluminous seven-volume record, we are urged by appellant, C. J. Dick Towing Company, to invoke the rule that where the testimony, or a substantial portion thereof, is by deposition, and the trial court had no better opportunity than this court to observe many of the witnesses and pass upon their credibility, it is our duty to review the entire record *de novo* without considering ourselves "bound to any extent by the findings of the District Court". See The Foundation Aranmore, 5 Cir., 165 F.2d 426, 428; Waterman S. S. Corp. v. United States S. R. & M. Co., 5 Cir., 155 F.2d 687; The Lapwing, 5 Cir., 150 F.2d 214, 215. However, we think the rule of review contended for here is too broad. The trial lasted for more than two weeks, and while the testimony of some eight witnesses was by deposition, the findings of the district court are also based in large measure upon substantial and convincing oral testimony.[5] See Escandon v. Pan American Foreign Corp., 5 Cir., 88 F. 2d 276. Admittedly, there is other testimony which, if believed, might have supported a contrary determination by the trial court.[6] But where, as here, the oral

5. The record reveals that some fourteen witnesses testified orally, including Scurlock and Bennett, Captain and Mate respectively of the Tug Leo, and Long, Mate of the Tug Dispatch, who were eye-witnesses to the collision on board their respective vessels. The trial court personally interrogated the witness Bennett at some length concerning the facts and circumstances of the collision.

6. Appellant, C. J. Dick Towing Company, argues in brief with convincing logic that if the barge, Bascom W. Smith, was on the south side of the channel at the time of the collision, as claimed by appellees, that a massive towing bitt weighing between 300 and 400 lbs. was blown by the explosion at least 350 feet to its final position in the Shattuck chicken yard on the north bank of the channel adjacent to the point of collision, as shown by photographic exhibits, and that this is highly improbable. Also, the extensive damage to the Shattuck property resulting from the explosion and fire, and the burning of a Cypress tree claimed to be abreast of the point of collision, supports the inference that the collision occurred closer to the north bank of the canal, rather than near the south bank, as claimed by appellees and found by the trial court. However, we think the trial court was justified in rejecting these facts and circumstances as inconclusive proof that the collision occurred on the north side of the channel, and in accept-

testimony relied upon to support the findings is in sharp dispute, we are no more authorized, merely because the case is in admiralty, to substitute our findings for those of the trial court under Admiralty Rule 46½, 28 U.S.C.A., than we would have been to substitute them for findings made under Rule 52(a), Fed.Rules Civ. Proc. 28 U.S.C.A., had this been a civil case tried without a jury. Colvin v. Kokusai Kisen Kabushiki Kaisha, 5 Cir., 72 F. 2d 44, 46; Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992, 995. Under such circumstances, since we cannot say that the findings of the trial court are "clearly erroneous", we accept them as binding upon this Court. Colvin v. Kokusai Kisen Kabushiki Kaisha, supra; Petterson Lighterage & Towing Corp. v. New York Central R. Co., supra; Ore Steamship Corp. v. D/S A/S Hassel, 2 Cir., 137 F.2d 326, 329; P. Dougherty Co. v. S. S. Manchester Exporter, 2 Cir., 140 F.2d 572, 573; The C. W. Crane, 2 Cir., 155 F.2d 940, 941; Merritt-Chapman & Scott Corp. v. United States, 2 Cir., 174 F. 2d 205, 206; see also Gatewood v. Sanders, 4 Cir., 152 F.2d 379; Lucayan Transports, Ltd. v. McCormick Shipping Corp., 5 Cir., 188 F.2d 202, 205; Hutchinson v. Dickie, 6 Cir., 162 F.2d 103, 106; Bornhurst v. United States, 9 Cir., 164 F.2d 789; Cappelen v. United States, 88 U.S.App.D.C. 11, 185 F.2d 754, 755; Cf. Johnson v. Cooper, 8 Cir., 172 F.2d 937, 940; 1 Am.Jur.Admiralty, Sec. 135, p. 613; 2 C.J.S.Admiralty, §§ 188, 192a, pages 321, 326; cf. Annotation in 103 A.L.R. 791, et seq.

█ Furthermore, we think the weight of the credible testimony supports, and we agree with, the findings of the district court as to the sole fault of the Tug Dispatch and her tow in the collision. Without undertaking to review all of the testimony, we refer to some evidence that leads us to that opinion.

The undisputed fact that at the time of the collision a north wind of 15 to 20 miles per hour was blowing the Leo's light barges toward the south bank of the canal lends strong support and credence to the testimony of the Tug Leo witnesses that the collision actually occurred in the Leo's waters.[7] This conclusion is further reinforced by the practically undisputed testimony that after the collision all navigable craft, including the damaged barge, BA–23, and the loaded barges of the Tug Dispatch, were carried by the wind and current over to the south bank of the canal. There is further convincing testimony that Manning, the deck hand on the Tug Dispatch, was playing music on the radio and in the pilot house with Captain Duncan until almost the moment of the collision, and was not paying proper attention to the position of the tow.[8] The direct inference from

ing instead the Tug Leo's witnesses' version of the collision.

7. The Witness, Bennett, mate and relief captain of the Tug Leo, testified as follows:

"A. After the signals were given, I noticed that the Tug 'Dispatch' had not altered its course at all and was proceeding at the same course she proceeded until the time of the collision.

"Q. And where with respect to the center line of the channel was he at the time he blew? Let's talk about his tug now first, as distinguished from his barges. Where was he then? A. His tug was to the northerly, more to the north bank, and the bow of his barges was more to the south bank.

"Q. Where with respect to the center line at the distance you were, where with respect to the center line was the bow of his bow barge? A. The bow of his bow barge was to the south of the center line."

8. The witness, Bobby Manning, testified before the investigating officer of the Coast Guard approximately six days after the accident as follows:

"Q. You were in the wheel-house when the collision happened? A. Yes, sir.

"Q. How long were you playing the radio? A. I don't know. We kept the thing on pretty nearly all the time—when it does play. It doesn't play half the time.

"Q. You didn't hear passing signals from the approaching vessel? A. No, sir. I heard them later on, but not at that time.

\* \* \* \* \*

"Q. Did your tug reduce speed at any time before the impact? A. No, sir.

"Q. Just kept right on going? A. Until we hit, and the bells and whistles.

Manning's testimony is that neither he nor Duncan, Captain of the Dispatch, were properly mindful of their navigation and in all probability failed to change the course they had set to round the gradual bend or turn in the canal, or to blow the danger signal, stop, and reverse engines when danger of collision should have been apparent. Under such circumstances, the trial court was amply justified in holding the Tug Dispatch and her tow solely at fault for negligent navigation and failing to maintain a proper lookout. Belden **v.** Chase, 150 U.S. 674, 702, 14 S.Ct. 264, 37 L.Ed. 1218; Petterson Lighterage & Towing Corp. v. New York Central R. Co., supra; Smith v. Bacon, 5 Cir., 194 F.2d 203, 206.

We find no merit in the contention of The Texas Company that the Tug Leo was guilty of mutual fault requiring a division of damages. The testimony fairly establishes that the Leo was maintaining a proper lookout and was on her south side of the channel on up until the time of collision. The argument that the Leo should have given a warning signal and taken other steps to avoid the collision when it became imminent is based upon the erroneous assumptions that the Leo was not entitled to rely upon the Dispatch's apparent ability to carry out the starboard passing to which she had assented, and further, that the Leo could have materially altered her course in time to avoid the impact. The testimony compels the inference that the same considerations as to wind and current, which caused both tugs to agree to the starboard to starboard passing, were operating to handicap the maneuverability of the Tug Leo and its tow in effecting any abrupt change of course after it had once attained its proper position on the south side of the channel. In such a situation the Leo was not bound to stop and lay up against the south bank of the canal in order to avoid the collision, but was justified in assuming, because of the greater maneuverability of the Dispatch and her tow, that they would effect a left rudder movement in time to execute the passing safely.[9] Wilson v. Pacific Mail Steamship Company, 276 U.S. 454, 462, 48 S.Ct. 369, 72 L.Ed. 651; The Delaware, 161 U.S. 459, 469. The testimony further effectively refutes the contention that the Leo was guilty of statutory fault in failing to render stand-by assistance after the collision.[10]

went to ringing then. I don't remember which way we were going. I was trying to get to them ratchets out there.

\* \* \* \* \*

"Q. What was done? A. The barge just kept swinging on in. After he blowed for the passing I turned around and looked, and couldn't see nothing but the bow of the boat coming. The skipper said, 'Oh, hell. Look yonder!' He went to ringing off, and just about the time she stopped she hit.

"Q. What do you mean? The motor stopped? A. Rung off. Rung off to back up and start in reverse.

"Q. How long before the collision was the motor stopped, approximately? A. Before the collision the motor wasn't stopped; we were going ahead when the collision hit.

"Q. Then the motor was not put astern before the collision? A. No. Just as soon as the collision hit. Something like that don't take more than 30 seconds to happen. The collision done hit.

\* \* \* \* \*

"Q. Was the telegraph put astern before the collision? A. Not that I know of.

"Q. Were you in a position to see? A. No, sir. I wasn't, because I was playing the radio and paying attention to the radio.

"Q. Didn't you just say that the Master said, 'Look here!' and you looked up and saw the bow of the tug approaching? A. Yes, sir."

9. The testimony of the Tug Leo witnesses, Scurlock and Bennett, shows clearly that they did not consider a collision imminent until the lead barge of the Dispatch tow was almost upon the middle barge of the Tug Leo, at which time it was too late to avoid the collision.

10. This argument is almost frivolous, for it appears that Duncan, Captain of the Dispatch, admitted that he asked the Tug Leo to get its barges out of the way after the collision occurred and that the Leo was merely complying with his request. The evidence further shows there were other rescue craft in the vicinity besides the Tug Leo which were capable of rendering assistance. This contention seems to have little basis either in law or fact. See Griffin on Collision, p. 609, and cases there cited.

856

■ The district court also properly concluded that appellee, The Texas Company, was entitled to recover from appellant, C. J. Dick Towing Company, the value of its damaged gasoline cargo. Under the plain language of the release of liability clause of the Transportation Agreement, Footnote 3, supra, the exercise of due diligence to make the barges seaworthy, and freedom from negligence in "the handling, care and custody of the cargo" were conditions precedent to Dick Towing Company's exemption from liability. Here, there is evidence that the Barge Bascom W. Smith, involved in the collision, had not been dry docked since 1945, and at the beginning of the voyage did not undergo more than a superficial examination of its forward rake tank to determine if it was water tight; that about seven hours before the collision here involved, the Dispatch ran her tow aground at another place in the Canal and the Bascom W. Smith was damaged; that the Dispatch and her tow thereafter proceeded with only a casual test and examination to determine whether the Smith barge was still seaworthy and fit for transporting appellee's gasoline cargo, and without removing this barge from its dangerous position at the head of the tow; that the Smith barge contained highly explosive gasoline vapor in its forward rake at the time of the collision and explosion and that, as the district court found, "the explosion caused by the condition of such rake tank started the fire that caused the major portion of the damage to everyone concerned."

It is true that when the "Release" clause of the Transportation Agreement is construed in connection with the "Jason" and "Force Majeure" clauses, also set out in footnote (3), supra, it appears ambiguous, and does not clearly define the extent of Dick Towing Company's liability for loss of or damage to cargo. However, construing the agreement most favorably to appellant, C. J. Dick Towing Company, and assuming it is protected under the Transportation Agreement as permitted by the Harter Act, 46 U.S.C.A. §§ 190–192, the above facts and circumstances can hardly constitute mere errors in navigation or in the management of the Dispatch and her tow, but furnish a substantial basis for the district court's finding of negligence both as to the custody and care of the cargo and lack of seaworthiness at the inception and during the voyage. See The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed 65; The Leerdam, D. C., 8 F.2d 295, affirmed Nederlandsche Amerikaansche Stoomvaart Maatschappij v. Mediteranian & General Traders, 5 Cir., 17 F.2d 586; Warner Sugar Ref. Co. v. Munson S. S. Line, D. C., 23 F.2d 194; The Framlington Court, 5 Cir., 69 F.2d 300; Cf. The Monarch of Nassau, 5 Cir., 155 F.2d 48.

■ On the issue of proper taxation of costs in the limitation proceeding, Commercial Petroleum and Transport Company contends that it was entitled to recover all its costs, including those in the limitation suit as well as those allowed.[11] The question presented is not without difficulty, as an examination of the authorities will reveal, but we think that the district court properly followed the *rationale* of Martin Marine Transp. Company v. Jakobson & Peterson, Inc., 2 Cir., 135 F.2d 325, and held with the Second Circuit that the expenses of initiating the limitation proceeding must be borne by its petitioner, Commercial Petroleum and Transport Company, who sought the benefit of it, rather than by appellant, C. J. Dick Towing Company. Cf. The W. A. Sherman, 2 Cir., 167 F. 976; The Walter A. Luckenbach, 9 Cir., 14 F.2d 100; The Stifinder, 2 Cir., 275 F. 271;

11. The district court allowed the Leo its costs of actually defending the asserted liability against it for the collision, but assessed against it the initial costs of instituting the limitation suit, holding that "a Claimant (C. J. Dick Towing Company) who loses either in a separate suit or by intervening in a suit for exoneration from or limitation of liability * * * should be taxed with *only the costs that arise with respect to such claim.*" The total costs in the limitation proceeding are about $7,000.00, which amount includes premiums on the bonds, clerks and marshals costs, commissioner's fees, etc.

Admiralty Rule 7, 28 U.S.C.A.; 46 U.S.C.A. § 185.

The judgment is affirmed throughout, both on the main and the cross-appeal.

Affirmed.