Everett TRAVIS, Libellant, Appellant,

v.

The MOTOR VESSEL RAPIDS CITIES, Its Engines, Tackle, Apparel and Furnishings, Respondents, and National Marine Service, Inc., a corporation, Claimant, Appellees.

No. 17123.

United States Court of Appeals Eighth Circuit.

April 17, 1963.

Douglas MacLeod, St. Louis, Mo., for appellant.

Robert S. Allen, St. Louis, Mo., for appellee; Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., on the brief.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

Everett Travis commenced this libel in admiralty against the Motor Vessel Rapids Cities. The National Marine Service, Inc., entered its appearance as claimant of the vessel and defended the action. The libel sought recovery in two counts. Count 1 asked for maintenance and cure due and owing to the libellant seaman, Everett Travis, because of heart disease. Count 2 claimed indemnity or damages in the amount of $25,000 as a result of failure to supply proper and adequate maintenance and cure, resulting in aggravation of libellant's condition. It incorporates all of the allegations of count 1, which include various acts and omissions on the part of the officers of the vessel, Rapids Cities, and of claimant employer.

Respondents-appellees in their answer denied any liability under count 1, claiming that Travis had been paid all the maintenance and cure to which he was entitled. They also claimed a forfeiture of the right to maintenance and cure, alleging that Travis refused proper medical care (at Lutheran Hospital in St. Louis), thus worsening his condition. As to count 2, they deny any failure to provide proper and adequate maintenance and cure as charged.

The issues as tried were, one, whether libellant was entitled to maintenance and cure in any amount and, if so, how much; and, two, whether libellant was entitled to indemnity for failure on the part of the master and employer to provide adequate maintenance and cure which might have resulted in a worsening of libellant's heart condition. On count 1, libellant was awarded $630 by the District Court. On count 2, libellant was awarded nothing. This appeal followed.

Because we view the contentions of the libellant-appellant as raising mainly questions of the sufficiency of the evidence to support the conclusions of the District Court, we deem it necessary to set out in considerable detail the evidence which is supportive of such conclusions.

In 1952 libellant went to work as a cook for the National Marine Service, Inc., owner of the vessel Rapids Cities. On February 26, 1960, libellant's wife, who also worked aboard the vessel, left to be hospitalized at the Public Health Service Hospital in Memphis, Tennessee. Travis finished his tour of duty on March 1, 1960, and traveled to Memphis to be with his wife. While visiting her he occasioned pains and shortness of breath. He consulted a doctor about his condition and was admitted to the hospital on March 10, 1960, with a diagnosis of angina pectoris. He was told that he had suffered a slight heart attack sometime in the past. Prior to this time but subsequent to his employment by the appellee, the libellant had experienced pains in his arms and chest but believed such to be caused by indigestion. Travis was discharged from the Memphis hospital on March 25, 1960, with permission to return to his duties after five days.

The captain of the Rapids Cities called Travis and his wife on the 28th of March, 1960, and requested them to return to work the next day. At this time libellant did not inform the captain of his condition. Travis and his wife boarded the vessel on March 29th and began their actual duties the following morning, March 30th. Travis stated that he showed the captain the discharge slip on March 30th but the latter did not remember seeing it, although the captain did admit that he was aware of Travis' ailment. Travis also claimed that he complained to the captain of pain in his arms and chest between March 30th and April 6th but the captain denied this.

On April 5, 1960, the boat took on grocery supplies and the libellant was required as part of his duties to lift a

case of canned milk weighing approximately 60 pounds over his head and to also lift two boxes of meat weighing about 75 pounds each. On the morning of April 6th the libellant awoke at 3:45 and complained to his wife of pains in his chest, arm and legs. He told her that he didn't believe he could work that morning. She got up and went out to find the first mate. Libellant testified that the first mate came to his room shortly after 3:45 a. m., informed him that he was going upstairs to awaken the captain and to get a doctor, and shortly thereafter returned and told Travis that he had done so. The mate testified that when he came to Travis' cabin he found him sitting on the edge of his bed fully dressed. He then went directly to the captain's quarters and awakened him and the captain got up immediately and began dressing. The mate was unable to state at what time all this transpired. It was between 5:30 a. m. and 5:40 a. m. when the captain did actually enter Travis' room for the first time. The captain stated that the mate did not awaken him until after 5:30 a. m. and that he went immediately to Travis' cabin, where he found him sitting on the edge of his bed.

At this time the boat was moored at Oquakwa, Illinois, about 12 miles north of Burlington, Iowa. Travis testified that the captain went to eat breakfast first and then returned, telling him that he had decided to return to Burlington by boat so that libellant might enter the hospital there. Travis stated that the captain could have used the mobile phone to call an ambulance rather than travel by boat. The captain testified that he went immediately to warm up the engines, which took about fifteen to twenty minutes, and that they started for Burlington about 6:00 a. m. The decision to go by boat rather than call an ambulance was attributed to the fact that it was 18 miles by road, some part of which was gravel and none too smooth, and that he felt the trip by water would be just as quick and not nearly so rough.

The boat proceeded downriver and after traveling about two miles it was discovered that one of the locks was impassable. As a result, it was necessary to go the final ten miles by automobile. To accomplish this, Travis rode in an automobile belonging to one of the lock attendants which was parked in a lot near the lock. Libellant was allowed to walk to the car. Travis claimed that the distance to the car was about a quarter of a mile, while others said it was 300 feet. It was also disputed among the witnesses whether or not Travis was offered a stretcher. Travis finally arrived at the Mercy Hospital in Burlington between ten minutes of seven and seven-thirty a. m. At 11:00 a. m., some four hours thereafter, he suffered another and more severe attack.

Travis remained in the Burlington hospital for 29 days. While there, he was treated with a drug called dicumarol, a blood thinner. During the entire period of 29 days he suffered 16 heart attacks. He was dissatisfied with his treatment in Burlington and asked permission to return to Memphis to consult the doctor who originally treated him there. The doctor suggested that he fly down or that he fly to Chicago and take an ambulance from there. Libellant said that he could not afford this and outfitted his station wagon with a cot in the back on which he could rest while his wife did the driving. Travis started on May 4, 1960, stopped over at his mother's home in DeSoto, Missouri, and arrived at the Memphis hospital on May 5th, where he was hospitalized for 46 days. He was discharged on June 16th but readmitted on September 12th and at that time stayed for 21 days. He was also readmitted in January and October of 1961. In addition to the admissions to the Memphis hospital, he was also admitted to Lutheran Hospital in St. Louis, Missouri, which has a contract with the Public Health Service. Moreover, Travis made trips from his home in Morrison, Missouri, to St. Louis every 30 days for out-patient treatment.

On one occasion he was on his way to Memphis when he suffered an attack and returned to be admitted to the Lutheran Hospital. There he was informed that he was about to be treated with dicumarol and as a result he left the hospital against medical advice. He stated that his reasons were that dicumarol was a dangerous drug to take outside of the hospital and that he did not want to stay at Lutheran but wanted to return to Memphis. This was on July 5th, he staying at the Lutheran Hospital only one day. On July 6, 1960, he started again for Memphis. On the way he stopped at his mother's home in DeSoto, Missouri, and while there sustained another attack. A personal physician was called and he was placed in an ambulance and returned to St. Louis. Instead of going to the Lutheran Hospital, he went to St. Luke's Hospital which had no contract with the Public Health Service. He was later transferred to Lutheran. Libellant admitted at the trial that his decision to leave Lutheran originally was a mistake.

Libellant admitted that all his medical bills were paid with the exception of the five-day hospitalization at St. Luke's and two or three consultations with private doctors at his home in Morrison. Travis was also given full wages for three months beginning on April 6, 1960, and since his attack he has been receiving Social Security benefits for total disability. It was the custom of the employer to give disabled employees three months' wages if their disability lasted that long.

After the introduction of considerable testimony with reference to maintenance and expense, it was stipulated by the parties that the rate of maintenance, if due at all, should be on the basis of $7.00 per day. Libellant also claimed that he had traveled by private automobile a distance of 7,123 miles in making trips back and forth to the hospitals and the out-patient clinic. Additionally, Mrs. Travis testified to expenses she necessarily incurred in attending her husband and driving for him on the various trips.

Three doctors testified at the trial. The first, a Dr. Boling, was called by the libellant. He was a recent employee of the Public Health Service in St. Louis, having been admitted to practice but a few months prior to his appointment. He had seen Travis on five different occasions. He testified that at the time of trial Travis was still under treatment. Travis had consulted with him as to the advisability of making a trip to California. He advised Travis that it was all right for him to make the trip. He refused to express an opinion as to whether or not Travis' condition would improve.

Dr. Rosecan, a private physician, was also called by libellant and testified in his behalf. He stated that libellant was presently unable to perform any manual labor and that his condition could not be cured. He did feel, though, that Travis could achieve certain symptomatic improvement if he were exposed to different treatment, such as making him hyperthyroid and re-treating him with digitalis which had been stopped because of its adverse effects. He admitted that digitalis is an indefinite treatment but that radioactive iodine (to promote the hyperthyroid condition) would be terminable in a matter of months with the exception of small dosages to avoid thyroid deficiency. Dr. Rosecan also testified that the lifting of the stores on April 5th could have had a detrimental effect and that the events subsequent to his attack at 3:45 a. m. on April 6th would have adversely and permanently affected Travis' heart condition. He diagnosed the April 6th attack as being most likely a coronary thrombosis but that it definitely resulted in a myocardial infarction. Upon cross-examination, the doctor stated that six months would be a reasonable time for scarring but that residual damage would continue. He also admitted that the organic damage itself could not be repaired. Additionally, he stated that he could not isolate any damage allegedly due to the delay in getting Travis to the hospital and that Travis' action in leaving Lutheran on

July 6, 1960, could also have had an adverse effect on his condition.

Dr. Hammond, called by the appellee, stated that Travis had reached a maximum point of recovery within about six months and that there is no cure for his condition. He was unwilling to attribute any causative or aggravating effect to Travis' duties aboard ship or the events following his first attack on April 6th. This doctor was of the opinion that activity seldom has anything to do with such attacks. While he agreed with Dr. Rosecan that the digitalis should be renewed in lesser dosages, he would not prescribe radioactive iodine treatment except in extreme cases. Finally, he said that Travis could perform light physical work which did not involve climbing of stairs or the lifting of weights of over 25 pounds.

The trial court found "significant" the fact that none of the treating physicians either at the Memphis hospital or at Lutheran Hospital prescribed or put libellant on radioactive therapy and also that Dr. Drew Luten examined Travis at the request of his proctor but was not called to testify at the trial.

The court made extensive findings of fact and conclusions of law in which it held that the libellant's condition had reached a static point six months after the April 6, 1960, attack and that he was thereby entitled to maintenance for that period minus the time for which he received full wages. Libellant was, therefore, awarded 90 days' maintenance at $7.00 or a total of $630. As to count 2, the trial court found that there was no negligence on the part of the captain of the Rapids Cities in getting Travis to the hospital and that there was nothing but speculation to support the theory that the acts of the appellee had caused or aggravated his condition in any way.

The findings and conclusions of a United States District Court sitting in admiralty call for application of the "clearly erroneous" rule or standard. In McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, the Supreme Court stated at page 20 of 348 U.S., at page 7 of 75 S.Ct.:

"* * * In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. *No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure.* Boston Ins. Co. v. Dehydrating Process Co., 204 F.2d 441, 444 (C.A.1st Cir.); C. J. Dick Towing Co. v. The Leo, 202 F.2d 850, 854 (C.A.5th Cir.); Union Carbide & Carbon Corp. v. United States, 200 F.2d 908, 910 (C.A.2d Cir.); Koehler v. United States, 187 F.2d 933, 936 (C.A.7th Cir.); Walter G. Hougland, Inc. v. Muscovalley, 184 F.2d 530, 531 (C.A.6th Cir.), cert. denied, 340 U.S. 935 [71 S.Ct. 490, 95 L.Ed. 675]; Petterson Lighterage & Towing Corp. v. New York Central R. Co., 126 F.2d 992, 994-995 (C.A.2d Cir.). A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed,' United States v. Oregon Medical Society, 343 U.S. 326, 339 [72 S.Ct. 690, 96 L.Ed. 978]; United States v. United States Gypsum Co., 333 U.S. 364, 395 [68 S.Ct. 525, 92 L.Ed. 746]. We do not find that the Court of Appeals departed from this standard, although we do disagree with the result reached under the application of the standard. In relation to the District Court's findings we stand in review in the same position as the Court of Appeals. The question, therefore, is whether the findings of the District Court are clearly erroneous." (Emphasis supplied.)

The "clearly erroneous" rule was reaffirmed by the Supreme Court in Guz-

man v. Pichirilo, 1962, 369 U.S. 698, 702, 82 S.Ct. 1095, 8 L.Ed.2d 205. See also T. H. Browning Steamship Co. v. F. H. Peavey & Co., 8 Cir., 1956, 235 F.2d 5, 6, and Johnson v. Cooper, 8 Cir., 1949, 172 F.2d 937, 940.

 The duty to furnish maintenance and cure arises out of a seaman's employment. The rule governing the extent or time for which maintenance and cure must be furnished in cases of permanent disability or chronic illnesses has been clarified by the Supreme Court in a number of cases. In Calmar S. S. Corp. v. Tayor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993, the court said, beginning at page 530 of 303 U.S., at page 654 of 58 S.Ct.:

"There remain the questions whether in the case of a chronic illness the duty continues so long as medical attendance and care are beneficial, until death if the need lasts so long, and whether a lump sum may be awarded to defray the cost of meeting the anticipated need.

* * * * * *

"* * * But we find no support in the policies which have generated the doctrine for holding that it imposes on the ship owner an indefinitely continuing obligation to furnish medical care to a seaman afflicted with an incurable disease, which manifests itself during his employment, but is not caused by it. So far as we are advised it is without support in the authorities. We can find no basis for saying that, if the disease proves to be incurable, the duty extends beyond a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment. This would satisfy such demands of policy as underlie the imposition of the obligation. Beyond this we think there is no duty, at least where the illness is not caused by the seaman's service.

* * * * * *

"* * * The amount and character of medical care which will be required in the case of an affliction, as well defined even as Buerger's disease, [here heart disease] cannot be measured by reference to mortality tables. * * *

"The seaman's recovery must therefore be measured in each case by the reasonable cost of that maintenance and cure to which he is entitled at the time of trial, including, in the discretion of the court, such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained."

In Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, the court stated at page 517 of 336 U.S., at page 710 of 69 S.Ct.:

"* * * We hold that he is entitled to the usual measure of maintenance and cure at the ship's expense, no less and no more, and turn to ascertainment of its bounds.

"The law of the sea is in a peculiar sense an international law, but application of its specific rules depends upon acceptance by the United States. The problem of the sick or injured seaman has concerned every maritime country and, in 1936, the General Conference of the International Labor Organization at Geneva submitted a draft convention to the United States and other states. It was ratified by the Senate and was proclaimed by the President as effective for the United States on October 29, 1939. 54 Stat. 1693. Article 4, paragraph 1, thereof, provides: '*The shipowner shall be liable to defray the expense of medical care and maintenance until the sick or injured person has been cured, or until the sickness or incapacity has been declared of a permanent character.*'" (Emphasis supplied.)

The court then pointed out, at page 518 of 336 U.S., at page 710 of 69 S.Ct.:

"That the duty of the ship to maintain and care for the seaman after the end of the voyage only until he was so far cured as possible, seems to have been the doctrine of the American admiralty courts prior to the adoption of the Convention by Congress, despite occasional ambiguity of language or reservation as to possible situations not before the court. It has been the rule of admiralty courts since the Convention.

"Maintenance and cure is not the only recourse of the injured seaman. In an appropriate case he may obtain indemnity or compensation for injury due to negligence or unseaworthiness and may recover, by trial before court and jury, damages for partial or total disability. But maintenance and cure is more certain if more limited in its benefits. It does not hold a ship to permanent liability for a pension, neither does it give a lump-sum payment to offset disability based on some conception of expectancy of life. Indeed the custom of providing maintenance and cure in kind and concurrently with its need has had the advantage of removing its · benefits from danger of being wasted by the proverbial improvidence of its beneficiaries. The Government does not contend that if Farrell receives future treatment of a curative nature he may not recover in a new proceeding the amount expended for such treatment and for maintenance while receiving it."

We think it the firm intendment of the cases to be that even if further treatment be required to maintain or hold static a chronic condition, such fact does not extend maintenance and cure if the seaman's recovery has become fixed and his disease is chronic or incurable. Cases involving heart disease have applied the principle so as to limit mainte-

nance and cure to the point of maximum recovery. See Robinson v. United States, 5 Cir., 1949, 177 F.2d 582, certiorari denied, 339 U.S. 923, 70 S.Ct. 611, 94 L.Ed. 1345; Muruaga v. United States, 2 Cir., 1949, 172 F.2d 318; United States v. Robinson, 5 Cir., 1948, 170 F.2d 578; Fernandez v. United Fruit Co., D.C.E.D.La.1960, 183 F.Supp. 642, affirmed 5 Cir., 1961, 287 F.2d 447; Lamon v. Standard Oil Co., D.C.E.D. La.1954, 117 F.Supp. 831. These cases conclusively support the proposition that when no further improvement can be expected, the obligation to furnish maintenance ceases, even though the seaman requires continued medical attention to prevent relapses or to restrain the progress of the disease.

The primary question, then, as to count 1 is whether the District Court's finding

"* * * that the maximum cure was effected six months after the initial attack on March 6th, [sic.; April] and accordingly claimant is not liable for maintenance and cure beyond six months after this date"

is clearly erroneous. Such finding of the District Court is, we believe, supported by substantial testimony in the record, is therefore not clearly erroneous and may not be set aside on appeal by this court. The testimony of Dr. Hammond alone supports the trial court's finding as to the point at which maximum recovery had been reached and other testimony in the record lends additional strength to that conclusion. Libellant here is doing no more than asking this, an appellate court, to substitute its judgment for that of the trial court on admittedly disputed issues of fact. That we may not do and insofar as the holding of the District Court with reference to the termination of maintenance and cure six months subsequent to April 6, 1960, is concerned, we must affirm.

Libellant claims error in the denial by the court of maintenance and cure during the three months period for which

libellant received wages. In that connection, the District Court said:

"* * * National Marine has paid Travis $1148.73, which represents three months' wages. For this three month period libelant is not entitled to additional maintenance and cure, Evans v. Schneider Transp. Co., 250 F.2d 710 (2nd Cir., 1957). As to the next three months, libelant is entitled to $7.00 a day as per the stipulation."

In Evans v. Schneider Transp. Co., the case relied on by the trial court, the libellant had recovered a $32,500 indemnity verdict for present and future lost earnings and for pain and suffering. Under a separate count the District Court also granted maintenance and cure for five separate periods following the injury. In reversing the award of maintenance and cure for three of these periods, the Court of Appeals stated that any loss of maintenance and cure during those periods was not the result of libellant's alleged disability. It further stated that for two of such periods the libellant had already recovered lost wages in the indemnity action and could not further recover maintenance and cure for the same time. In support of this statement the court cited cases holding that maintenance and cure cannot again be recovered when they are already included in an indemnity verdict. E. g., Ortiz v. Grace Line, Inc., 2 Cir., 1957, 250 F.2d 124, and McCarthy v. American Eastern Corporation, 3 Cir., 1949, 175 F.2d 727, 729, certiorari denied, 338 U.S. 911, 70 S.Ct. 349, 94 L. Ed. 561. In McCarthy, Judge Maris stated at pages 728 and 729:

"Since the evidence established that the libellant's wages included not only cash but also room and board, it is clear that the amount of the damages which he sought from the jury in the civil action included not only the cash wages lost by reason of his injuries but also the cash value of the board and lodging which he would have received had he remained in the employ of the respondent as a seaman aboard the Gadsden. * * * As we have seen, the libellant recovered in the civil action a verdict and judgment amounting to $22,500. It is not suggested that this amount is inadequate to indemnify him in full for his *loss of wages and board and lodging,* for his loss of earning power and for his pain and suffering. It is clear, therefore, that he has thereby recovered the value of the maintenance which he is claiming in the present suit.

\* \* \* \* \* \*

"* * * It follows, therefore, that *when an injured seaman recovers full damages in an action for indemnity based upon unseaworthiness and negligence in which he has claimed loss of wages including the value of the board and lodging which form part thereof and medical expenses, if any, he has thereby recovered the maintenance and cure to which he is entitled up to the time of trial, at least.*

"While the recovery by an injured seaman of a judgment for maintenance has been held not to bar a subsequent suit by him for indemnity upon the ground of unseaworthiness or negligence it does not follow that a particular item of his claim, such as maintenance, if recovered in one suit, may again be recovered in another. For in the admiralty as elsewhere in the law a litigant may not recover compensation for a single claim more than once." (Emphasis supplied.)

We believe that the full import of the statement in Evans is that the libellant may not recover twice for the same thing and that such statement could not defeat libellant's claim for both wages and maintenance and cure in the instant case.

■ Had the libellant here been on board ship and been receiving board and room during the time of the claimed convalescence, he would not be entitled to separate maintenance. When a seaman is not aboard ship but is convalescing

from his illness, he is entitled to maintenance and cure. Payment of wages for three months, which was the custom, was in addition to and not a substitution for maintenance and cure. See Ortiz v. Grace Line, Inc., supra, where the court said at page 125:

" * * * The trial court in its charge to the jury included, as proper damages for negligence and unseaworthiness, damages ordinarily recoverable for maintenance and cure. *A verdict on the first count, therefore, precluded recovery for the same damages on the claim for maintenance and cure; and the trial court properly allowed only alternative recovery.*" (Emphasis supplied.)

See also Krey v. United States, 2 Cir., 1941, 123 F.2d 1008, and Penedo Cia Naviera S. A. v. Maniatis, 4 Cir., 1959, 262 F.2d 284, 287, where the Court of Appeals for the 4th Circuit stated:

"There was no error in the inclusion in the judgment of an allowance for wages as well as for maintenance. (Citations.)"

Travis here has not recovered maintenance and cure in any other action. He was entitled to it during his period of convalescence. Cf. Vaughan v. Atkinson, 1962, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88, and Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L. Ed. 850.

■■■ The error, however, has not damaged libellant. The record indicates very clearly that during the six months period following April 6th he was confined in a hospital for in excess of 90 days. He obviously was not entitled to maintenance during that hospitalization, for the payment of the hospital bills included maintenance. See Calmar S. S. Corp. v. Taylor, 1938, 303 U.S. 525, 531, 58 S.Ct. 651, 82 L.Ed. 993. No credit was given therefor by the District Court. The deduction of the maintenance and cure during the period for which wages were paid on the one hand and the failure to deduct maintenance and cure dur-

ing the hospitalization on the other so nearly balance that applying the *de minimus* doctrine, we affirm on that point.

■■■ Libellant claims error in failure of the court to allow his claim for mileage and the expenses of his wife in transporting him on many occasions to the various hospitals wherein he was confined and wherein he received treatment. We believe the court did inadvertently overlook passing upon such claims. The record indicates that the libellant was entitled to transportation expenses for authorized or essential trips during the six months period. See generally Spellman v. American Barge Line Co., 3 Cir., 1949, 176 F.2d 716, and Robinson v. Swayne & Hoyt, D.C.S.D. Calif., 1940, 33 F.Supp. 93. This of necessity requires a reversal on this point with direction to the District Court to ascertain and include in the decree an allowance to the libellant for such amount as it finds represents proper transportation expense.

■■■ As to the claim under count 2, the trial court stated:

"Libelant contends that his condition was aggravated by claimant's failure to provide him with maintenance and cure. Libelant's theory is based on claimant's alleged negligence in allowing libelant to return to work on the day prior to the day when he was certified as fit for duty by Dr. Elliot, and claimant's alleged negligence in getting him to a hospital. However, on both of these grounds, libelant fails as he cannot show that either of these acts caused or aggravated his injury. [T]o prevail libelant must show that his reporting the night of the 29th instead of the morning of the 30th, caused him injury. Similarly, he must show that the delay in getting him to a hospital caused him injury. See Becht and Miller, *The Test of Factual Causation in Negligence and Strict Liability Cases.* There is no evidence to show such causation. There is some evidence that these

acts 'could have' aggravated the injuries, but it is too speculative to be adopted by this Court.

"In any event, the Court finds that the captain acted reasonably under the circumstances and, accordingly, not negligently in getting libelant to the hospital. Similarly, we find that there was no negligence in allowing the libelant to board ship on the 29th instead of the 30th."

We believe that the trial court's conclusion is not completely erroneous but is well supported in the record and that any recovery under count 2 would have to be based on sheer speculation and conjecture. Accordingly the findings of the lower court as to count 2 are affirmed.

This decree is reversed and the cause remanded to the District Court for further proceedings in conformity herewith.